THEODORE N. LERNER, ET AL.

V.

THE GUDELSKY COMPANY, ETC., ET AL.

Record No. 821304

September 6, 1985

Present: All the Justices

*John T. Hazel, Jr. (Grayson P. Hanes; Richard W. Hausler; Hazel, Beckhorn and Hanes*, on briefs), for appellants.
*Haynie S. Trotter (E. A. Prichard; Thomas F. Farrell, II; Boothe, Prichard & Dudley*, on brief), for appellees.

RUSSELL, J., delivered the opinion of the court.

In this appeal from a decree ordering forfeiture of a purchaser's earnest-money deposit, the dispositive question is whether there was a breach of an express condition precedent, relieving the purchaser of his duty to perform the contract.

In the early 1960's, The Gudelsky Company (Gudelsky), Ammerman Investment Limited Partnership (Ammerman), and Theodore N. Lerner, Annette M. Lerner, and Lerner Enterprises (collectively and individually Lerner), as partners, developed the Tyson's Corner Regional Shopping Center (Tysons I) at the confluence of State Routes 7 and 123 and Interstate 495 in Fairfax County. During development of the center in 1963, the partners acquired 117 acres of vacant land, the subject of this controversy, across Route 123 from the shopping center. Title was taken in the names of Theodore N. Lerner and H. Max Ammerman as trustees for a separate partnership, called GLA Apartments, formed by the three investors. The name reflected the partners' original intention to develop the 117-acre tract for high-rise apartment use, for which it was then zoned. It has remained vacant until the present time. The ownership interests of the partners were: Gudelsky, 65%; Ammerman, 10%; and Lerner, 25%.

In the mid-1970's, the partners applied to Fairfax County for a change in zoning which would permit the development of a second regional shopping center or an alternative mix of high-rise office buildings and hotels on the 117-acre tract, which was then called "Tysons II." In support of their zoning application, the partners submitted several written "proffers" to Fairfax County, consisting of commitments which the owners bound themselves to perform as conditions to commercial use of the property. These proffers included: (1) construction of a six-lane public road, one-half mile in length, called "International Drive," which would run through the tract and connect to Route 123; (2) construction of a connector public road across the front of the property parallel to Route 123; (3) construction of private internal circulating streets to serve the shopping center; and (4) dedication of approximately five acres of right-of-way for a future bridge and interchange at the intersection of International Drive and Route 123, together with a contribution of $1 million to the cost of constructing the bridge. If the land were developed as a shopping center, all of the foregoing would be required. If it were developed for office and hotel use, only International Drive would be required, and items 2, 3, and 4 would be omitted.

The studies and negotiations attending the rezoning application consumed four years. During this time, the Virginia Department of Highways and Transportation (VDH&T) became involved in the process because of its concern with the sufficiency and safety of the highway network in the area. VDH&T reviewed the proffers and advised Fairfax County that they were "reasonable." However, VDH&T was not a party to the proffers and there is no contention that it was legally bound to honor them. In 1978, Fairfax County granted the rezoning of Tysons II, subject to the proffers.

By 1980, the partners had concluded that the most advantageous use of the property was for office buildings and hotels rather than for an additional regional shopping center. Although the change would greatly reduce the highway requirements of the proffers the partners were aware that VDH&T, which was not bound by the proffers, might still demand substantial additional contributions from a developer of offices and hotels, beyond those contained in the proffers, as a prerequisite to a permit granting access to Route 123. It is undisputed that Route 123 had become heavily congested since the completion of Tysons I and that it con-

stituted the only practicable access to Tysons II. In the final analysis, any proposed development of Tysons II was entirely dependent upon the conditions which VDH&T might decide to impose as a prerequisite to a grant of access to Route 123.

In light of this situation, Gudelsky and Ammerman decided to sell Tysons II rather than attempt its development. Lerner considered buying the other partners' interests and developing the property alone. The partners discussed possible sale to parties named Trammell-Crow in Dallas, to Zuckerman in Boston, to Rozansky and Kay in Maryland, and to Lerner himself. The Partners, advised by their attorney to protect themselves against any charge of withholding information concerning the imponderables of VDH&T's potential demands, agreed that any contract contain an explicit acknowledgement by the purchaser that he had been advised of those hazards. On May 10, 1980, Zuckerman made an offer to purchase Tysons II for $25 million. The proposed contract contained a clause, paragraph 6(c), inserted at the insistence of Gudelsky and Ammerman, intended to make clear the purchaser's knowledge, to authorize the sellers to agree to some additional VDH&T demands, and to limit the purchaser's liability therefor.[1]

---

[1] (c) Purchaser has been advised that the Virginia Department of Highways, Fairfax County and other government authorities intend to seek modifications of the terms and conditions of the Proffer and, in addition, may require from the owner of the Property substantial contributions toward the cost of roads and other onsite and offsite improvements as a condition for obtaining the requisite approvals for any future development and construction to or upon the Property. Subject to the provisions of Paragraph 6(b) hereof, prior to the Closing, Sellers shall not agree or consent to any amendment or modification of any of the terms or conditions of the Proffer unless Sellers' shall have secured Purchaser's prior written approval to any such amendment or modifications. Purchaser agrees that he will not unreasonably withhold his approval to any such amendment or modification. Purchaser and his agents and representatives shall have the right to participate in all meetings, discussions and negotiations concerning the Proffer and any proposed amendment or modification thereof, and Sellers agree to notify Purchaser reasonably in advance of the time and place of all such meetings, discussions and negotiations. In the event Sellers shall desire to agree to a proposed amendment or modification of the Proffer but Purchaser shall decline to approve of such proposed amendment or modification, and if the net difference in costs and expenses between the implementation of the amendment or modification proposed by Sellers and the amendment or modification, if any, that would be acceptable to Purchaser does not exceed the total sum of One Million Dollars ($1,000,000.00), Sellers shall have the right to refer such disagreement to Escrow Agent for resolution. If Escrow Agent determines, in his judgment, that failure to agree to the Sellers' proposed amendment or modification of the Proffer rather than the position advanced by the Purchaser will materially impair the

The language of paragraph 6(c) was selected by Gudelsky and Ammerman, was agreed to by Zuckerman's counsel, and was inserted in Zuckerman's proposed contract as well as in those submitted by other prospective purchasers. Lerner took no active role in the negotiations with Zuckerman because, as stated above, he had decided to buy out the interests of Gudelsky and Ammerman.

When Lerner refused to sign Zuckerman's proposed contract, Gudelsky and Ammerman dissolved the GLA partnership and instituted this suit, praying for a winding-up of the partnership and confirmation of the sale to Zuckerman. During the proceedings, Lerner submitted an offer to purchase the land from the partnership for $25.1 million.

The court confirmed neither offer, but by agreement of the parties conducted a courtroom auction sale, on May 26, 1981, to the highest bidder. Under the agreed procedure, bidding was restricted to Zuckerman and Lerner. Each bidder filed with the court a signed contract, containing provisions identical to those in Zuckerman's earlier proposed contract, with the price left blank to be filled in with the amount of the successful bid.

At the sale, Lerner became the successful bidder at a price of $35 million, all cash at settlement.[2] Lerner deposited with the court earnest money amounting to $1.5 million, for which the parties now contend. Settlement was to be on January 28, 1982. The contract provided that the deposit was to be paid to the sellers as liquidated damages if Lerner failed to perform. The contract also provided, in section 12, entitled "Conditions Precedent to the Obligations of the Purchaser:"

The obligation of the Purchaser to purchase the Sellers' Partnership Interests shall be subject to the satisfaction of

ability to develop the Property as an office park, Sellers shall have the right to consent to the amendment or modification proposed by Sellers notwithstanding the failure of Purchaser to approve of such amendment or modification, and from and after the closing Purchaser shall be bound by such amendment or modification and shall hold Sellers and GLA Apartments free and harmless therefrom. In the event the Lerners agree to assume and be bound by all the provisions of this Sales Contract, the amount of Two Million Dollars ($2,000,000.00) shall be substituted in place of One Million Dollars ($1,000,000.00) in the fourth sentence of this Paragraph 6(c).

[2] Rather than a sale of land, Lerner actually purchased the 75% interests of Gudelsky and Ammerman in the GLA partnership. Because he already owned a 25% interest, Lerner was ordered to pay $26.25 million at settlement.

each of the following conditions (all or any of which may be waived, in whole or in part, by the Purchaser):

(a) The representations and warranties made by the Sellers in Section 7 shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of such date.

. . . .

(c) The Land shall contain not less than 105 acres which are zoned C-7, and such zoning classification shall permit the development of office and hotel buildings containing a gross floor area equal to the total area of the Land, including the land located within easements, rights-of-way and parking areas (*i.e.*, an FAR of 1:1), subject to a height limitation of not lower than 90 feet above ground level (except as otherwise provided in the Proffer).

Section 7(c), incorporated by reference into the foregoing "conditions precedent," provided:

(c) Sellers do not have any knowledge or information of any change contemplated in any applicable laws, ordinances or restrictions, of any judicial or administrative actions, of any action by adjacent landowners, or of any natural or artificial conditions upon the Land, which would prevent or impede Purchaser or the Partnership from developing and constructing office and hotel buildings on the portion of the Land zoned C7, and residential buildings on the portion of the Land zoned R30, except for the Proffer.

On June 25, 1981, Lerner met with VDH&T officials to satisfy himself that a permit for access from International Drive to Route 123, indispensable for the development of Tysons II, was still available. He received an affirmative response and was told to prepare and submit engineering drawings for approval. Lerner assembled a team of planners, architects, and traffic specialists who prepared a highway access plan in compliance with the proffers and submitted it to VDH&T.

On October 30, 1981, Donald E. Keith, Division Administrator for VDH&T, wrote to Lerner's engineers denying the issuance of a permit. Keith's letter stated:

> The plan, as submitted, has been thoroughly reviewed by the various staff elements of the Virginia Department of Highways and Transportation. On this basis, I must advise you that the plan is unacceptable, and I would be unable to issue a permit for such a connection to Route 123 on the grounds that, with this design and in consideration of the traffic volumes, as submitted, the intersection of Route 123 would be far below a level of service found acceptable to this department.

Later, at trial, Keith testified that his intent in writing this letter was simply "[t]o deny the issuance of the permit for the connection [of] International Drive to Route 123."

The Fairfax County Director of Transportation was as surprised by the denial as was Lerner. Both had expected approval. In late November, Lerner and his counsel met in Richmond with W. L. Brittle, Jr., VDH&T's Director of Engineering, to determine whether the denial might be reversed, and if so, upon what terms. Brittle responded by letter dated December 2 that the permit would only receive "favorable consideration" if Lerner (1) widened Route 123 to provide an additional "thru-lane in both directions" from Route 7 to Route 495, a distance of about a mile; (2) dedicated right-of-way for the proposed interchange to handle "future traffic projections," (3) committed himself to pay a pro rata share of the construction of an "ultimate interchange," and (4) extended the commitment to "at least the year 1995."

Brittle explained to Lerner's engineers in early December that the proposed improvements would be expected to produce at least a minimally adequate "level of service" (called "level D") in the entire corridor of Route 123 through the Tysons area. He advised them that if a permit were issued, it would be granted only as an interim measure. If, during the development of Tysons II, traffic were to become excessive, falling below the stipulated "level of service" in the opinion of VDH&T, the permit would be cancelled and all development of Tysons II would be halted. Brittle further stated that VDH&T would have no funds to pay its pro rata share of the cost of the highway improvements for "six to eight years"

in the future. VDH&T never advised Lerner of the amount of land and money he would be expected to contribute.

Lerner asked his engineers to attempt to estimate the cost, in direct contributions and lost land, of Brittle's proposed remedies. By mid-December, they advised Lerner that the cost would amount to a minimum of $26.8 million, and would entail the loss, by dedication without payment, of over six acres of land from Tysons II. Lerner's share of the prorata cost would be $11.6 million, but even if that sum were contributed in advance, VDH&T would not have the funds to go forward with its share of the construction costs for "six to eight years," as stated above.

Against this gloomy background, Lerner notified counsel for Gudelsky and Ammerman, by letter of December 11, 1981, that the conditions precedent to his obligation to purchase Tysons II could not be satisfied, enclosing copies of the correspondence from VDH&T. On December 21, Lerner filed a motion in the trial court for a return of his $1.5 million deposit. After hearing the evidence *ore tenus* on April 6 and 7, 1982, the court issued a letter opinion, followed by a decree, holding that Lerner's $1.5 million deposit should be forfeited. We granted Lerner an appeal.

The court, relying on testimony received over Lerner's objection at the hearing,[3] found that Lerner had extensive experience in dealing with VDH&T going back to 1975 and was aware that substantial expenditures might be required to develop the road system; that Lerner had failed to persuade the court that VDH&T's denial of a permit for access to Route 123 was an "administrative action" which would so impede the development of Tysons II as to constitute failure of a condition precedent; that the contract was ambiguous; that Lerner had drafted it; and that it should therefore be construed against him.[4] The court did not construe paragraph 6(c) to impose a $2 million "cap" on additional highway expenditures to which Lerner might be committed without his consent.

---

[3] The court's opinion erroneously states: "Since there is some ambiguity, the Court, without objection from the parties, has looked to outside evidence and circumstances to determine the parties' intent with respect to the meanings of Paragraph 6(c) and 7(c)." Our review of the record indicates that Lerner made repeated objections to the admission of this evidence, including a continuing objection.

[4] As stated above, the language was originally drafted by counsel for the sellers, but was adopted by Lerner and incorporated into his offer. Because we hold the contract to be plain and unambiguous, however, rules of construction are inapplicable.

■ In our view, the court erred in the foregoing rulings. We adhere to the "plain meaning" rule in Virginia. Where an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. This is so because the writing is the repository of the final agreement of the parties. *Berry* v. *Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).

■ Here, the parties were entitled to rely on the express terms of the written agreement executed in blank and completed by the court at the auction sale on May 26, 1981. It provided that the sellers, as of the date of settlement, would have no knowledge of any administrative action which would prevent or impede office and hotel development of Tysons II in accordance with its zoning classification, and that the continuing truth of that representation would be a condition precedent to Lerner's obligation to purchase. These provisions are clear and unambiguous. The court erred in relying on extrinsic evidence to ascertain Lerner's degree of sophistication, experience, or specific knowledge concerning the hazards to which he might be exposed by the possible demands of VDH&T. In *Berry*, we said "[appellants] ask us to adopt a rule permitting extrinsic evidence of the intentions of the contracting parties, regardless of the clarity of the contract language. . . . We decline the invitation." *Id.* at 208, 300 S.E.2d at 796 (citation omitted). We reaffirm our holding in *Berry*. The court will not write a new contract for the parties even when, in light of the facts known to them, the court might think they should have adopted different language. The court should have given effect to the plain words of the agreement.

■ The court evidently placed the burden of proving failure of the conditions precedent upon the purchaser, Lerner, because the letter opinion states "First, the Purchaser has not persuaded the Court that VDH&T's action is an administrative action." The court then determined that "VDH&T's requirements are fluid, open and negotiable." The result, in the court's view, was that the VDH&T demands made development of Tysons II "more expensive and less desirable," but did not "prevent or impede development." This ruling arose from a misallocation of the burden of proof. A party seeking to recover on a contract right must allege and prove performance of any express conditions precedent upon which his right of recovery depends. This allocation of the burden is opposite to that which applies to alleged breaches of warranties

and conditions subsequent. *Morotock Ins. Co.* v. *Fostoria Novelty Co.*, 94 Va. 361, 364-65, 26 S.E. 850, 851 (1897); *see also Trailsend* v. *Va. Holding Corp.*, 228 Va. 319, 324, 321 S.E.2d 667, 670 (1984); *Aetna Casualty Company* v. *Harris*, 218 Va. 571, 578, 239 S.E.2d 84, 88 (1977). Here, Gudelsky and Ammerman had the burden of proving that the express conditions precedent had been satisfied, as a prerequisite to establishing Lerner's obligation to perform the contract. The deposit could be forfeited only if Lerner had an obligation to perform, and repudiated or breached it.[5]

Gudelsky and Ammerman adduced no evidence that the conditions precedent had been satisfied, nor could they have done so. It is undisputed in the evidence that Tysons II could not be developed for the office-hotel mix contemplated by the contract unless VDH&T granted a permit providing adequate access to Route 123. It is further undisputed that Lerner acted in good faith to obtain the requisite permit, providing engineering drawings in accordance with the proffers which VDH&T had earlier found "reasonable," and was surprised when his application was flatly denied. In the wake of these developments, there was no way in which Gudelsky and Ammerman could have carried their burden of showing that the conditions precedent had been satisfied. Their contention, adopted by the court, that the VDH&T officials may not have meant precisely what they said, or might later have been persuaded to compromise in exchange for vague and unspecified commitments of Lerner's land, time, and money, is speculative and conjectural at best.

Because of the refusal of a permit by VDH&T, and the seller's knowledge thereof at the pertinent time, there was failure of a condition precedent upon which Lerner's obligation to perform was dependent. The plain language of the agreement was designed to protect him against dangers of the very kind which in fact arose. He was, therefore, entitled to return of his earnest-money deposit. We will accordingly reverse the decree appealed from and remand the cause to the trial court for the entry of a decree consistent with the views expressed in this opinion and for

---

[5] The parties implicitly conformed to the common-law rules regarding the burden of proof by the express terms of their agreement. Section 14(b) provides that the deposit shall be paid to the sellers as liquidated damages "[i]f all conditions precedent to the closing have been satisfied and Purchaser defaults in the performance of its obligation to purchase the Partnership Interests at the time required therefor . . . ."

such further proceedings as may be requisite with respect to winding up the partnership.

*Reversed and remanded.*

COCHRAN, J., dissenting.

My reading of the record leads me to the opposite conclusion from that reached by the majority.

I agree with the trial judge that the contract in controversy is not free from ambiguity. The majority are of opinion that the contract is clear and unambiguous and that extrinsic evidence, under familiar principles, was improperly admitted. Although the parties appeared to shift their positions on this question at trial, it appears that both adduced extrinsic evidence that was properly admitted. Thus, the Sellers proffered a 1975 letter written by counsel for Lerner, the Purchaser, to the County Executive stating that the estimated cost of development of an extended highway plan was in excess of $10 million. Lerner's counsel objected on the ground of relevancy but later said, "I have no objection to the letter." The court thereupon admitted the letter into evidence as an exhibit.

Subsequently, Lerner's counsel asked his client his understanding of the provisions of Paragraph 6(c) of the contract. Over objection by counsel for the Sellers, the court permitted the witness to answer that it provided a maximum of $2 million increase in cost if there was a change in the proffer. It thus appears that from time to time each side felt the necessity of adducing extrinsic evidence to assist in construing an unclear contract.

Moreover, the full memorandum of a meeting held on February 22, 1980, characterized by one witness as "Ted Lerner's bombshell," and attended by Lerner and his counsel, was admitted without objection. As the trial judge stated in his letter opinion, the memorandum showed that Lerner was on notice that there would be problems with the State Department of Highways and Transportation (the Department) over the cost and timing of highway development for the project.

The evidence admitted without objection fully justifies the trial court's conclusions. This evidence established certain facts deemed significant by the trial court: that Lerner or his attorney had dealt with the Department for years concerning the development of the

property; that in 1975 Lerner's attorney knew that cost to the landowner of development of highways serving the property would exceed $10 million; that Lerner and his attorney were on notice that substantial commitments would be required of a developer to construct highways; and that the memorandum of the meeting on February 22, 1980, shows that Lerner was on notice that there would be problems with the Department over the cost and timing of road construction.

The court also relied on the contents of Exhibit 5 admitted into evidence over Lerner's objection. This exhibit, a letter whose contents were made known to Lerner, showed that the Sellers were concerned with the expense not only of compliance with the terms of the proffer but of other requirements for construction of roads, bridges and other improvements. In admitting this evidence, the trial court stated that the letter was attached to an earlier contract identical to the present contract, was made available to Lerner, and had some bearing on the meaning of certain portions of the contract, about which the testimony of two witnesses "unobjected to" had been received.

The trial court resolved ambiguities in the contract against Lerner because his counsel drafted it. Although it appears that some of the language in controversy had been selected by the Sellers for inclusion in earlier contracts, Lerner acknowledged that the contract under which he claims was prepared by his attorney. Under these circumstances, I conclude that the trial court ruled properly in resolving ambiguities against Lerner.

The trial court analyzed the language in Paragraphs 6(c) and 7(c). The court pointed out that 6(c) provided for two contingencies, first, amendment and modification of the proffer, which the Department and others intended to seek, and second, payment by the Purchaser of substantial contributions toward the cost of roads and other improvements. The cap of $2 million applied only to the additional cost incident to amendment and modification of the proffer if approved by the Sellers, either with or without the consent of the Purchaser. The court properly rejected Lerner's contention that the cap provided a maximum increase in cost for improvements and that 6(c) should be construed to mean "amendments and modifications *resulting* in substantial sums."

The court considered the Department's rejection of the proffer in conjunction with the testimony of the Department witness and concluded that the Department's requirements were negotiable.

The court further was not persuaded that the requirements of the Department prevented or impeded development within the meaning of the contract. Obviously, the change in requirements would make development more expensive and less timely. But I agree with the trial court that the Department's rejection of the proffer did not relieve Lerner. The majority conclude that the Sellers had the burden of showing that all conditions precedent had been met and that the Sellers did not and could not carry this burden because of the Department's action. I disagree with this conclusion.

Under Paragraph 7(a) it was provided that the Sellers had no knowledge or information of any "administrative action" which would "prevent or impede" the Purchaser from developing and constructing office and hotel buildings on the land. I construe this provision as a promise not to withhold relevant information from the Purchaser. The Sellers were informed by Lerner's counsel, after the contract had been executed, of the Department's change of plans. The Sellers, therefore, were not withholding information. There was no provision that a change of plans by the Department or other governmental agency, if known to Sellers and Purchaser, would relieve the Purchaser from all liability. Rejection of the proffer did not activate the provisions of Paragraph 7(c).

Lerner was not a novice, but an experienced business man thoroughly familiar with this property and with the risks inherent in dealing with the Department, an agency allocating limited funds to meet the most meritorious requests for highway improvements. He and his counsel and others undoubtedly were surprised when the Department rejected the proffer. Disappointment, however, does not justify a breach of contract. Lerner and his counsel had been conducting the extended negotiations with the Department with confidence that favorable action would result. This was a business risk, however, that, contrary to all expectations, proved to be unsound. I read the contract to protect the Sellers in the event of additional financial demands by the Department, as one of the Sellers testified, without objection, it was intended to do. In my view, the trial court did not err and its judgment should be affirmed.

STEPHENSON, J., joins in dissent.