**Anil K. GULATI and Maria A. Gulati, Plaintiffs,**

v.

**COYNE INTERNATIONAL ENTERPRISES CORP., d/b/a Coyne Textile Services, Defendant.**

**Civ. A. No. 3:92CV265.**

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 5, 1992.

---

Thomas Fleming Eubank, Carlton Lindsay Brown, Spinella, Owings & Shaia, Richmond, Va., for plaintiffs Anil and Maria Gulati.

David Edward Constine, III, Mays & Valentine, Richmond, Va., for defendant Coyne Intern. Enterprises, Corp. d/b/a Coyne Textile Services.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Anil K. Gulati and Maria A. Gulati (collectively referred to as "Gulati") instituted this action in the Circuit Court of the City of Richmond alleging that Coyne International Enterprises Corp. ("Coyne") had breached a contract for the purchase of real estate. Coyne removed the action to this court. Gulati filed an amended complaint, and Coyne filed a counterclaim seeking return of the deposit it made against performance of the contract, plus interest. Gulati seeks damages in the amount of $116,551.16, representing the difference between the contract price and the price for which the real estate was sold, as well as additional expenses alleged to have been caused as a consequence of Coyne's breach including mortgage payments, taxes and utilities. Following document production and depositions, Coyne moved for summary judgment on the claim against it and on its counterclaim. For the reasons set forth below, Coyne's motion for summary judgment is granted.

### Statement of Facts

On September 28, 1989, Gulati and Coyne entered into a Contract to Purchase ("the Contract"), pursuant to which Coyne agreed to buy a two story office/warehouse building (the "Property") located in the Hermitage Business Park in Richmond, Virginia. Coyne, which is engaged in the industrial laundry business, intended to use the Property as an industrial laundry facility at which to rent and launder a variety of industrial items such as work clothes, coveralls, smocks, pants, jackets, gloves and towels. The offices for the laundry facility also were to be located on the Property.

The contract explicitly conditioned Coyne's obligation to purchase on the satisfaction of a number of contingencies. Paragraph 7 of the contract, which allowed Coyne to terminate the Contract if the contingencies were not satisfied, provides:

> In the event that any one of the contingencies herein set forth is not satisfied, except as specifically provided in this Contract to Purchase, the Buyer [Coyne] may terminate this Contract to Purchase at the Buyer's sole option, in which case

the Seller [Gulati] agrees that the Buyer's deposit shall be refunded in full to the Buyer, whereupon this Contract to Purchase shall be null and void, and the buyer shall thereupon have no obligations or liability to the Seller under this Contract to Purchase or otherwise.

Coyne took a number of steps to facilitate the closing of the transaction and to satisfy the contingencies upon which its obligation to purchase was conditioned. For example, Coyne secured environmental studies and inspections, obtained title insurance, and obtained assurances from the City of Richmond that the property was properly zoned for use as an industrial laundry. Coyne also arranged for a commitment for satisfactory financing. Most contingencies were to be satisfied within thirty (30) days of the execution of the Contract.

The contingency upon which the outcome of this action depends is set forth in paragraph 14 of the Contract, which provides:

> This Contract to Purchase is expressly contingent upon the Buyer obtaining written verification from the Hermitage Road Associates and all other appropriate entities that the use of the Realty for an industrial laundry is authorized under all applicable restrictions covering the Realty. This written verification is to be obtained within thirty (30) days of the execution by both parties of this Contract to Purchase.

The parties agree that the "restrictions covering Realty" referred to in paragraph 14 are those set forth in the Declaration of Restrictions of Hermitage Road Industrial Park (the "Declaration"). Both parties further agree that the purpose and intent of paragraph 14 of the Contract was to afford Coyne the opportunity to obtain written verification before closing that the use of the Property as an industrial laundry was a permitted use under the Declaration. That is also clear from the text of the Contract, and is confirmed by Mr. Gulati's deposition testimony.

Article III of the Declaration states that permitted uses of the property "include industries that manufacture, process, assemble, and/or package goods and materials that are dependent upon raw materials refined elsewhere," and that are not otherwise objectionable for a number of specific reasons. Article III lists a number of industries which are *per se* permitted uses, and then describes a number of other activities as "permitted uses". Under Article II of the Declaration, the Architectural Approval Committee of Hermitage Road Industrial Park ("AAC") is specifically given responsibility for interpreting Article III of the Declaration in the event of any disagreement respecting what uses are permitted.

Notwithstanding the clear and unambiguous language of paragraph 14 of the Contract and the interpretation of the contractual language subscribed to by both parties, Gulati bases its theory of liability against Coyne, and its opposition to the summary judgment, on subparagraph 1 of Article II of the Declaration which provides in pertinent part:

> No improvements, signs, outdoor lighting, fences, walls, landscaping, parking facility, storage yard, walkway or utility structures shall be erected, placed or altered on any building site until the building or other improvement plans, specifications and plot plan showing the location of such improvements on the particular building site have been submitted to and approved in writing by the Architectural Approval Committee ... as to conformity and harmony of external design with existing structures in the Park, and as to location of the improvements on the building site giving due regard to the anticipated use thereof as the same may affect adjoining structures, uses and operations, and as to location of the improvements with respect to topography, grade and finished ground elevation.

Gulati contends that satisfaction of the contingency in paragraph 14 of the Contract impliedly required Coyne to secure approval from the AAC of the plans and specifications for the improvements which Coyne intended to make in furtherance of the use of the Property as an industrial laundry facility. Gulati also contends that Coyne

failed to exercise good faith in attempting to satisfy the contingency established in paragraph 14 by not submitting designs and plans for the improvements to the AAC for approval when it sought the verification of permitted use.

Gulati does not dispute that Coyne made extensive efforts to secure written verification from the AAC that use of the Property as an industrial laundry was a permitted use under the Declaration. These efforts began in September, 1989 before the Contract was executed. Coyne's efforts continued without success into October, 1989, when it became necessary for Coyne to secure a thirty (30) day extension of the period allowed for satisfaction of the contingency in paragraph 14. Gulati granted the extension at the end of October, 1989 (before expiration of the original thirty (30) day period), and Coyne immediately began another series of communications with the AAC in an effort to obtain the written verification respecting the proposed use of the property as an industrial laundry.

On November 22, 1989, Coyne received a letter dated October 10, 1989, authored by the chairman of the AAC. The letter stated that the AAC approved the proposed use of the property as a textile laundry operation, and expressed the view that "to the best of its [the AAC's] knowledge, the use does not violate the applicable recorded restrictive covenants." At approximately the same time, however, Coyne also received a letter from another member of the AAC stating that all members of the AAC were "supposed to have an opportunity to review and act upon proposed new construction changes to existing development." Because the approval set forth in the letter dated October 10, 1989 was qualified, did not contain the signatures of all members of the AAC and did not state unconditionally that the proposed use was permitted, Coyne believed that it did not satisfy the contingency established in paragraph 14 of the Contract. Gulati does not dispute Coyne's position respecting the effect of that letter. By this time, however, the extended time period for satisfying the contingency had almost expired and, notwithstanding Coyne's efforts to obtain another

extension, no further extension was obtained.

Coyne nonetheless continued its efforts to satisfy the contingency. During that process Coyne received a letter dated December 4, 1989, from a lawyer ("Joynes") who was acting in the interests of Gulati and Sit'N Sleep, Inc., a corporation owned by Mr. and Mrs. Gulati, to help facilitate the sale of the Property. Joynes advised Coyne as follows:

> The third issue concerns the approval of Hermitage Road Associates. After reading Don Charles' letter, I think I have figured out why this matter remains unsolved. Mr. Charles is addressing the Architectural Approval Committee's power and duty to approve signage, landscaping, and similar design concerns. Approval of Coyne's design plans is not a contingency to the contract, however— the contract contingency, set forth in paragraph 14 of the Contract merely requires written verification from Hermitage Road Associates that 'the use of the Realty for an industrial laundry is authorized under all applicable restrictions covering the Realty.' ... Since the Declaration does not specifically state that an industrial laundry is a permitted use, presumably, you thought it prudent to require that the Committee's imprimatur be obtained. Accordingly, it seems to me that if we can get Mr. Charles' mind off of design considerations which are irrelevant to the contingency and probably premature anyway, and to get the chair of the Committee to sign a one-sentence letter which simply states that the contemplated *use* is a permitted one, the contingency will be satisfied. (emphasis in original).

Mr. Gulati testified at his deposition that, at the time he received a copy of Joynes' letter, it correctly reflected his view respecting satisfaction of the contingency in paragraph 14 of the Contract. Mr. Gulati further testified that he never informed Coyne or anyone else of a different view. Although certain of Gulati's discovery responses state that Joynes was acting only on behalf of Sit'N Sleep, Inc. when he

wrote the letter dated December 4, 1989, counsel for Gulati acknowledged in oral argument that Joynes had actual or apparent authority to speak for Mr. and Mrs. Gulati on this issue.

In fact, Joynes agreed to help Coyne obtain the necessary verification from the AAC and, on December 6, 1989, Coyne specifically asked Joynes to secure a letter from the AAC "confirming that the use of the property as an industrial laundry is a permitted use under the restrictive covenants." Coyne enclosed a suggested form letter to be signed by the members of the AAC, which would satisfy the requirements of paragraph 14 of the Contract. Joynes agreed to obtain the signatures of the members of the AAC. Although it now appears that he was successful in obtaining signatures from two members of the AAC, the fully executed letter of verification was never returned to Coyne.

In furtherance of Coyne's overall efforts to purchase the Property, but unrelated to the satisfaction of the contingency in paragraph 14, Coyne prepared a set of designs and plans for the improvements to be made on the Property in the event that the AAC verified that the Property could be used as an industrial laundry facility. Coyne intended to submit those designs and plans to the AAC for approval as provided in Article II of the Declaration. On January 2, 1990, Coyne delivered a site plan and two design plans for the exterior of the industrial laundry facility to Gulati's real estate agent for delivery to the AAC. At the same time, Coyne submitted to Gulati's real estate agent another draft letter intended to secure written verification from the AAC that use of the property as an industrial laundry facility was a permitted use under Article III of the Declaration. Coyne expected that all members of the AAC would sign this document, thereby satisfying the contingency in paragraph 14 of the Contract. Also on January 2, 1990, Coyne told Gulati that Coyne would be prepared to close on the sale if all contingencies were satisfied within 2 weeks.

However, by January 16, 1990, Coyne had not received written verification from the AAC that the use of the property as an industrial laundry was a permitted use under Article III of the Declaration. On January 17, 1990, Coyne terminated the Contract pursuant to the terms of paragraph 7 and requested Gulati to return the $5,000 deposit.

### The Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' " that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992). Once this initial showing under Rule 56(c) is made, the burden of production, not persuasion, shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e); *Catawba Indian Tribe*, 978 F.2d at 1339.

In meeting this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. That party must demonstrate that there is a *"genuine issue for trial."* Fed.R.Civ.P. 56(e) (emphasis added); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

Considering the applicable standard, the court turns to the merits of Coyne's motion.

### Discussion

The amended complaint alleges a breach of contract arising from Coyne's alleged failure to exercise good faith efforts to satisfy the contingency in paragraph 14 of the Contract. Gulati does not deny Coyne's extensive efforts to satisfy this contingency. Gulati's only basis for asserting that Coyne failed to act in good faith in its efforts to satisfy the contingency is Coyne's failure to submit plans and specifications to the AAC to enable it to approve or disapprove any improvements, signs, outdoor lighting, fences, walls, landscaping, parking facilities, storage yards, walkway or utility structures which Coyne intended to erect on the Property. Gulati's position is legally indefensible for several reasons.

■ First, the clear and unambiguous language of the Contract simply does not obligate Coyne to do more than secure written verification that use the Property for an industrial laundry was a permitted use under the Declaration. Paragraph 14 does not obligate Coyne to submit, or to secure the approval of, any design plans or specifications respecting improvements it intended to erect upon the Property.

Second, neither the Gulati's, nor the lawyer acting on their behalf in December, 1991, advanced the strained interpretation of paragraph 14 now urged in response to Coyne's motion for summary judgment. To the contrary, Joynes previously expressed an interpretation of paragraph 14 entirely consistent with that here advanced by Coyne. Moreover, in his deposition in this action Mr. Gulati admitted that he shared Joynes' interpretation of paragraph 14 at the time it was advanced in December, 1991. Gulati further acknowledges that neither Joynes nor Coyne was ever informed of any differing interpretation of paragraph 14.

■ Third, it is undisputed that Coyne made extensive efforts to satisfy the contingency in paragraph 14 of the Contract. The efforts made were reasonable and substantial and, significantly, Gulati does not suggest otherwise. When those efforts failed to achieve the satisfaction contemplated by both parties of the contingency specified in paragraph 14, Coyne exercised its contractual right under paragraph 7 to terminate. The record is thus devoid of any evidence of bad faith, either in satisfying the contingency in paragraph 14 or in exercising the right to terminate in paragraph 7 of the Contract.

It is settled under Virginia law that a "party seeking to recover on a contract must allege and prove performance of any expressed conditions precedent upon which his right of recovery depends." *Lerner v. Gudelsky,* 230 Va. 124, 334 S.E.2d 579, 584 (1985). The satisfaction of a condition precedent is not required, however, where the party charged with satisfying the condition has prevented or hindered its occurrence by failing to pursue that obligation in good faith. Restatement (2nd) of Contracts, Section 225, Comment (b) (1981).

Coyne prosecuted reasonably, fully, and in good faith its obligation to attempt to satisfy the contingency in paragraph 14 of the Contract. Gulati does not contend otherwise, except to argue that Coyne was obligated to submit plans and specifications for future improvements. As set forth above, the clear and unambiguous language of paragraph 14 of the Contract and the interpretation accorded it by both parties was that the Contract did not obligate

Coyne to take such actions to satisfy the contingency in paragraph 14. Hence, as a matter of law, the failure of Coyne to take those actions cannot support an action for breach of the obligation to pursue in good faith satisfaction of the contingency.

Paragraph 7 of the Contract afforded Coyne the right to terminate if the contract contingencies were not timely satisfied. Coyne was lawfully entitled to terminate the Contract when it was unable to secure satisfaction of the contingency in paragraph 14, having made good faith and reasonable efforts to do so. Accordingly, Coyne also was entitled to refund of its deposit and Gulati's refusal to return the deposit constitutes a breach of its obligation under paragraph 7 of the Contract.

The deposit has been held in an interest bearing escrow account. The parties have advised the court that in lieu of interest on its deposit, Coyne will receive the proceeds from the interest bearing account.

### Conclusion

For the foregoing reasons, Coyne's motion for summary judgment on the Amended Complaint and on its Counterclaim is granted and Coyne shall be entitled to all proceeds held in the interest bearing escrow account in which the deposit of $5,000 is held.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so Ordered.