**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DAVID R. MACDONALD; THOMAS P.
ONDECK, on their own behalf and on
behalf of all the partners of BOM
Associates Limited Partnership,
Plaintiffs-Appellees,

No. 95-1219

v.

LAWYERS TITLE INSURANCE
CORPORATION,
Defendant-Appellant.

DAVID R. MACDONALD; THOMAS P.
ONDECK, on their own behalf and on
behalf of all the partners of BOM
Associates Limited Partnership,
Plaintiffs-Appellants,

No. 95-1220

v.

LAWYERS TITLE INSURANCE
CORPORATION,
Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-94-706)

Argued: September 28, 1995

Decided: March 15, 1996

Before RUSSELL, Circuit Judge, CHAPMAN,
Senior Circuit Judge, and BEATY, United States District Judge for
the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** F. Douglas Ross, ODIN, FELDMAN & PITTLEMAN, P.C., Fairfax, Virginia, for Appellant. Richard A. Gross, ROSEN-MAN & COLIN, Washington, D.C., for Appellees. **ON BRIEF:** J. Mark Young, ROSENMAN & COLIN, Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This action arises from a mistake made by Lawyers Title Insurance Corporation ("Lawyers Title") when it issued a title insurance commitment to BOM Associates Limited Partnership ("BOM"). Due to its own error, Lawyers Title neglected to except six mechanics liens encumbering the property on which it issued the commitment. When Lawyers Title subsequently refused to issue a title insurance policy according to the terms of the commitment, the plaintiffs brought this action against Lawyers Title. The district court granted summary judgment in favor of the plaintiffs and awarded damages based on the cost of removing the six mechanics liens from the property. Both parties appeal the judgment of the district court. Finding no merit in either parties' argument, we affirm the judgment of the district court.

I.

David R. MacDonald and Thomas P. Ondeck were limited partners in Merrifalls Plaza Limited Partnership, which owned property known as Merrifalls Plaza (the "Property"). The Merrifalls Plaza Limited

2

Partnership borrowed money from Ameribanc Savings Bank ("Ameribanc") and made two promissory notes payable to Ameribanc in the amount of $2,800,000 and $156,000. These notes were secured by two deeds of trust against the Property.

Before lending this money to the Merrifalls Plaza Limited Partnership, Ameribanc had obtained title insurance on the Property, which served as the collateral for the promissory notes. Ameribanc purchased its policy from Chicago Title Insurance Company ("Chicago Title"), which issued a title insurance policy to Ameribanc only after MacDonald and Ondeck had first agreed to indemnify Chicago Title for any loss associated with this title insurance policy.

The Merrifalls Plaza Limited Partnership defaulted on the notes. William Casterline (the "Trustee"), the substitute trustee under the two deeds of trust, made preparations to foreclose on the Property. The Trustee ordered a title insurance commitment from Real Title Company, Inc. ("Real Title"), an agent of Lawyers Title. Real Title reviewed the title and prepared a report, which listed six mechanics liens filed against the Property. Nevertheless, Real Title issued to the Trustee a Lawyers Title Commitment for Title Insurance (the "Commitment"), effective June 4, 1993, without excepting any of the six liens from its commitment.

The Trustee sent notices to interested parties and advertised the foreclosure sale. Before the date of the sale, one of the lienholders informed the Trustee that he wanted to assert a claim against the Property. This lienholder was one of the six whose liens were not excepted in the Commitment. The Trustee notified Real Title that the lienholder had asserted a claim and that the foreclosure sale was scheduled for July 8, 1993. Neither Real Title nor Lawyers Title responded before July 8. Relying on the Commitment, the Trustee proceeded with the foreclosure sale despite the lienholder's assertion of a claim against the property. BOM Associates ("BOM") was the high bidder. MacDonald and Ondeck were limited partners in BOM Associates.

After the foreclosure sale, Real Title issued a revised title commitment in which it excepted the six mechanics liens. BOM, however, demanded that Lawyers Title issue insurance based on the original

3

Commitment. Lawyers Title refused to issue such an insurance policy.

BOM subsequently contacted Chicago Title to inquire whether it could avail itself of coverage under the title insurance policy that Chicago Title had issued to Ameribanc. Chicago Title agreed that, under the continuation of coverage provision, BOM could succeed to Ameribanc's rights under the Chicago Title policy. However, it reminded BOM that MacDonald and Ondeck had agreed to indemnify it for any losses and expenses incurred.

Chicago Title expended $85,551.01 to remove the six mechanics liens against the Property. Three of the liens were invalid. The other three liens were settled for $12,000.00, $12,500.00, and $35,000.00. Legal fees and costs accounted for the remaining $26,051.01. Thereafter, Chicago Title filed an action against, inter alia, MacDonald and Ondeck to enforce the indemnity agreement and to recover the $85,551.01 it expended. MacDonald and Ondeck settled that suit by paying Chicago Title $83,986.45.

MacDonald and Ondeck, on their own behalf and on behalf of BOM, brought this action against Lawyers Title for breach of its title insurance commitment. In Count I of its complaint, the plaintiffs sued for $154,606.92, representing the face value of the six mechanics liens encumbering the Property at the time of the foreclosure sale. In Count II of its complaint, the plaintiffs sued for the $83,986.45, representing the amount MacDonald and Ondeck paid to Chicago Title as indemnification for its expenses in removing the six mechanics liens from the Property.

The district court granted summary judgment in favor of the plaintiffs in the amount of $83,986.45. Lawyers Title has appealed. The plaintiffs have filed a cross-appeal, arguing that the district court should have awarded damages in the amount of $154,606.92. We address each argument in turn, but we find no merit in any of the arguments.

II.

This Court reviews de novo the district court's granting or denying of summary judgment. Lone Star Steakhouse & Saloon, Inc. v. Alpha

4

of Virginia, Inc., 43 F.3d 922, 928 (4th Cir. 1995). Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A.

In its primary argument on appeal, Lawyers Title concedes for the sake of argument that it had an obligation to issue title insurance and to cover the costs of removing the six mechanics liens. Lawyers Title argues that, notwithstanding its obligation, BOM has no claim against Lawyers Title because BOM suffered no damages from Lawyers Title's breach of its title insurance commitment.

Lawyers Title justifies its position by explaining the case in the following way. BOM, as the purchaser of the Property at the foreclosure sale, was the beneficiary of the Lawyers Title's title insurance commitment issued to the Trustee. When Lawyers Title refused to issue a title insurance policy conforming to the commitment, BOM could have sued Lawyers Title for its breach. Lawyers Title, however, chose another course of action: it sought coverage under the title insurance policy that Chicago Title had issued to Ameribanc. Chicago Title extended coverage to BOM and removed the six mechanics liens from the Property at a cost of $85,551.01. Thus, to Lawyers Title's fortuity, BOM took clear title to the Property without incurring any expenses of its own. According to Lawyers Title, BOM had a choice between suing Lawyers Title under the title commitment issued to the Trustee or suing Chicago Title under the title policy issued to Ameribanc; BOM simply elected to pursue its remedy against Chicago Title.

Lawyers Title mischaracterizes the facts. Chicago Title did not remove the mechanics liens from the Property at no expense to BOM. BOM, through MacDonald and Ondeck, paid to have them removed. Although Chicago Title issued a title insurance policy on the Property, Chicago Title never assumed any risk under that policy. Chicago Title agreed to issue a policy only after MacDonald and Ondeck first agreed to indemnify Chicago Title for any loss incurred on the policy. In effect, Chicago Title's policy was nothing more than a retention of Chicago Title's services to handle any litigation required to remove

5

any liens on the Property. Ultimately, MacDonald and Ondeck had to pay for the cost of clearing title.

Lawyers Title insists, however, that we must distinguish between BOM as a corporate entity and MacDonald and Ondeck as individual persons. BOM, not MacDonald and Ondeck, was the beneficiary of Lawyers Title's commitment. BOM, not MacDonald and Ondeck, sought coverage under Chicago Title's title insurance policy. Although MacDonald and Ondeck, in their individual capacities, had to indemnify Chicago Title for the costs of removing the mechanics liens from the Property, BOM itself did not have to indemnify Chicago Title.

We find Lawyers Title's argument to be overly-formalistic. MacDonald and Ondeck were limited partners of BOM and co-presidents of BOM's general partner. Clearly, MacDonald and Ondeck directed the actions of BOM. When Lawyers Title breached its Commitment, MacDonald and Ondeck could have directed BOM to remove the liens at its own expense and then sue Lawyers Title for breach of its Commitment. Presumably, MacDonald and Ondeck thought they were doing just that when they had Chicago Title remove the liens, indemnified Chicago Title in their individual capacities, and then sued Lawyers Title for damages. For purposes of this case, we conclude that the formalism of the corporate structure should not prevent us from merging the interests of BOM with those of MacDonald and Ondeck.

Thus, when Lawyers Title breached its Commitment, BOM elected to remove the liens on the Property at its own expense. BOM asked Chicago Title to clear title to the Property, knowing that it--through MacDonald and Ondeck--would have to indemnify Chicago Title for its expenses. Chicago Title did not do BOM any favors; BOM's limited partners had to pay $83,954.45 to remove the liens from the Property. The plaintiffs therefore had a legitimate action against Lawyers Title for its breach of its Commitment.

B.

Lawyers Title also argues that it had no duty to issue title insurance because the Trustee did not satisfy the conditions precedent to the

6

issuance of title insurance. See Lerner v. The Gudelsky Co., 334 S.E.2d 579, 584 (Va. 1985) (holding that "[a] party seeking to recover on a contract right must allege and prove performance of any express conditions precedent upon which his right of recovery depends"). Schedule B, section 1 of the Commitment provides that:

> This company must be furnished with proof that the foreclosure proceedings were carried out in accordance with applicable statutes and the terms and provisions of the Deed of Trust.

Lawyers Title maintains that the Trustee did not meet this condition precedent because the foreclosure proceedings were not carried out in accordance with the applicable statutes. Specifically, Lawyers Title argues that (1) the Trustee did not advertise the foreclosure proceedings as required by statute, and (2) William Casterline, the Trustee, began foreclosure proceedings before he was appointed to his position.

Lawyers Title correctly maintains that the Trustee did not comply with Virginia's requirements for advertising a foreclosure sale. Under Virginia law, a trustee overseeing a foreclosure sale must advertise the sale once a week for four consecutive weeks, unless the deed of trust provides otherwise. Va. Code Ann. § 55-59.2(A)(2) (Michie 1995). Because the Deeds of Trust in the instant case contained no provision governing the advertisement of a foreclosure sale, the Trustee was required to place four advertisements of the foreclosure sale. However, the Trustee placed advertisements on only two days: June 28, 1993 and July 6, 1993.

Despite the Trustee's failure to properly advertise the foreclosure sale, the Trustee nonetheless carried out the foreclosure sale in accordance with Virginia law. Section 55-59.2(E) specifically provides that "[f]ailure to comply with the requirements for advertisement contained in [§ 55-59.2] shall, upon petition, render a sale of the property voidable by the court." Va. Code Ann. § 55-59.2(E) (Michie 1995).*

_____

*The Virginia General Assembly enacted § 55-59.2(E) in 1992 in response to the Virginia Supreme Court's decision in Deep v. Rose, 364

7

Because nobody challenged the validity of the foreclosure sale, the sale was legitimate despite the lack of proper notice.

Lawyers Title also argues that William Casterline, the Trustee, began foreclosure proceedings before he was appointed to his position as Trustee. Casterline was appointed to his position as Trustee by two documents, each entitled Deed of Appointment of Substitute Trustee, entered into by BOM and Ameribanc. The two documents were dated June 24, 1993, and were signed by BOM on that same day. However, before Ameribanc had a chance to sign the documents, which it did on June 29, 1993, Casterline began foreclosure proceedings. Specifically, Casterline placed the first advertisement of the foreclosure sale and sent the required fourteen-day notices of sale to interested parties.

We do not reach the question of whether Casterline was vested with the Trustee's powers on June 24, 1993 or June 29, 1993. Instead, we conclude that, even if Casterline had exercised the powers of Trustee before his actual appointment, the foreclosure sale was nonetheless carried out in accordance with Virginia law. We have already stated that, under § 55-59.2(E), the failure to comply with the advertisement requirements of § 55-59.2 renders a foreclosure sale voidable, not void. Thus, even if Casterline did not have the authority to advertise the foreclosure sale on June 28, 1993, the foreclosure sale was still valid. Nobody challenged Casterline's authority to place that advertisement, just as nobody challenged the fact that the foreclosure sale was advertised only twice, instead of the required four times.

Similarly, the foreclosure sale was valid even if Casterline did not have the authority to send fourteen-day notices of sale to interested

_____

S.E.2d 228 (Va. 1988), in which the court held that the failure to comply with the advertisement requirement of § 55-59.2(A)(1) rendered the forfeiture sale void. The requirement at issue in Deep provided that "the [forfeiture] sale shall be held on any day following the day of the last advertisement which is no earlier than eight days following the first advertisement nor more than thirty days following the last advertisement." Va. Code Ann. § 55-59.2(A)(1) (Michie 1995). The enacting of § 55-59.2(E) ensured that the violation of any of the advertisement requirements in § 55-59.2 would render the forfeiture sale voidable, not void.

8

parties. Section 55-59.1(A) of the Virginia Code requires the "trustee or the party secured" to send notices of the foreclosure sale to certain interest parties "no less than fourteen days prior to such sale . . . ." Va. Code Ann. § 55-59.1(A) (Michie 1995). However, § 55-59.1(C) expressly provides that the "[f]ailure to comply with the requirements of notice contained in this section shall not affect the validity of the sale, and a purchaser for value at such sale shall be under no duty to ascertain whether such notice was validly given." Va. Code Ann. § 55-59.1(C) (Michie 1995). Thus, the foreclosure sale was valid even if Casterline did not have the authority to send the notices of sale to interested parties.

Despite any errors in the advertisement and notice of the foreclosure sale, BOM was the valid purchaser of the Property. Lawyers Title cannot use the technical errors of the foreclosure sale to escape its duty to issue a title insurance policy on the Property.

C.

Lawyers Title also argues that it had no duty to issue title insurance because the Commitment did not identify either the proposed insured or the amount of the policy. The Commitment expressly states:

> This Commitment shall be effective only when the identity of the proposed insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by [Lawyers Title], either at the time of the issuance of this Commitment or by subsequent endorsement.

Schedule A of the Commitment merely stated that each was "to be determined." Because the identity of the proposed insured and the amount of the policy were never identified on Schedule A, Lawyers Title argues that the Commitment never took effect.

The parties stipulated that "[i]t is the customary practice in Virginia that when a foreclosing trustee obtains a commitment for title insurance prior to foreclosure, the named insured and amount of the policy are left open to be determined by the high bid at the foreclosure sale." Statement of Stipulated Fact 7 (J.A. 45). The parties followed the customary practice in this case.

9

Despite the parties' adherence to the customary practice, Lawyers Title argues that the Commitment nonetheless failed to identify the proposed insured and the amount of the policy. A court should not consider extrinsic evidence when interpreting an unambiguous contractual provision. See Schneider v. Continental Casualty Co., 989 F.2d 728, 731 (4th Cir. 1993). A contract is ambiguous if it is capable "of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983). Thus, Lawyers Title argues, we must follow the unambiguous language of the Commitment and conclude that the Commitment never took effect because the proposed insured and the amount of the policy remained unidentified.

We reject Lawyers Title's position. The unambiguous provision of the Commitment was satisfied: the Commitment identified the proposed insured with the words "To Be Determined" and the amount of the policy with the words "AMOUNT TO BE DETERMINED." By using these words instead of leaving these provisions of Schedule A blank, the parties to the Commitment indicated that they had reached some sort of agreement as to the identity of the proposed insured and the amount of the policy. What is ambiguous is the meaning the words "to be determined." When we consider the customary practice in Virginia, however, it is clear what the parties meant. The identity of the proposed insured and the amount of the policy are determined by the high bid at the foreclosure sale. The intention of the parties would have been clearer if Lawyers Title had stated on Schedule A that the proposed insured is "the high bidder at the July 8, 1993 foreclosure sale" and that the amount to be insured is "the amount of the high bid at the July 8, 1993 foreclosure sale." Nonetheless, we find that, given the customary practice in Virginia, Lawyers Title's shorthand phrases sufficiently identified the proposed insured and the amount of the policy.

We also reject Lawyers Title's position because its interpretation of the contractual language would render the Commitment illusory. Lawyers Title completed Schedule A of the Commitment, designating the proposed insured and the amount to be insured with the ambiguous expressions "To Be Determined" and "AMOUNT TO BE DETERMINED," respectively. At the foreclosure sale on July 8,

10

1993, the proposed insured and the amount to be insured became clear. But, Lawyers Title never completed its ministerial duty of inserting the name and amount in Schedule A of the Commitment. Even when it issued a revised Commitment on July 12, 1993, it still stated that the proposed insured and the amount of the policy were to be determined. Under Lawyers Title's interpretation of the Commitment, Lawyers Title had the unilateral power to invalidate the contract by simply neglecting to carry out its own ministerial duty.

We refuse to interpret the Commitment in a way that renders the whole contract void. See Wilson Mushroom Co. v. Davis Distribs. Inc. (In re Davis Distribs., Inc.), 861 F.2d 416, 419 (4th Cir. 1988) (citing Newport News Shipbuilding & Drydock Co. v. United States, 226 F.2d 137, 142-43 (4th Cir. 1955), which stated "a construction which would render the provision of a contract of doubtful validity is to be avoided, if another reasonable construction can be placed upon it"); Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 277 (4th Cir. 1987) (citing Cordovan Assocs., Inc. v. Dayton Rubber Co., 290 F.2d 858, 861 (6th Cir. 1961), which stated that"[w]here a contract is susceptible to different interpretations, the court will adopt the one which will give it validity, if it is reasonable, rather than one which renders it illusory"). Instead, we conclude that Lawyers Title identified the proposed insured and the amount of the policy when it wrote "To Be Determined" and "AMOUNT TO BE DETERMINED" on Schedule A. If not earlier, the Commitment certainly became effective on the day of the foreclosure sale, when the proposed insured and the amount of the policy were identified. Lawyers Title cannot escape its obligation to issue a title insurance policy simply because it neglected to identify the proposed insured and the amount of the policy more precisely in Schedule A.

III.

Furthermore, we find no merit in the plaintiffs' cross-appeal. The plaintiffs argue that they should have recovered $154,606.92, which is the total of the face value of the six mechanics liens on the Property. This amount includes the three mechanics liens that, when Chicago Title took action to remove the liens, turned out to be invalid.

The plaintiffs argue that Bluff Ventures Limited Partnership v. Chicago Title Insurance Co., 950 F.2d 139 (4th Cir. 1991), and Title

11

Insurance Co. of Richmond v. Industrial Bank of Richmond, 157 S.E. 710 (Va. 1931), support this result. They argue that the rule in those cases is clear: damages are measured as the extent of impairment of title on the date the insured receives the impaired title. On the day that BOM purchased the Property, the face value of the liens on the Property amounted to $154,606.92. The plaintiffs thus argue that the district court should have awarded that amount in damages.

The plaintiffs misread the cases. When the complicating detail of the cases are stripped away, both Bluff Ventures and Industrial Bank roughly reduce to the following scenario:

> The plaintiff purchased property at a foreclosure sale. A title insurance company, the defendant, insured clear title to the property, but the property turned out to be encumbered by a lien. Nonetheless, the plaintiff subsequently sold the property to a third party for an amount greater than his bid at the foreclosure sale plus the amount of the lien. In the plaintiff's suit against the title insurance company, the title insurance company argues that the plaintiff was not damaged because his subsequent sale of the property covered the cost of the lien.

See Bluff Ventures, 950 F.2d at 141-43; Industrial Bank, 157 S.E. at 714. Both courts found that the plaintiff, relying on the title insurance policy, believed it would receive unimpaired title to the property. Id. "The insurer's liability became fixed when the insured relying on the policy made a bid at the [foreclosure sale] and failed to receive the subject-matter of its purchase unimpaired by [the lien]." Industrial Bank, 157 S.E. at 715, cited in Bluff Ventures, 950 F.2d at 143. At the foreclosure sale, the plaintiff "thought it obtained an unimpaired title, but it did not. At that time it suffered a loss equal to the amount of the lien . . . ." Industrial Bank, 157 S.E. at 714, cited in Bluff Ventures, 950 F.2d at 143. The fact that the plaintiff was later able to sell the property at a price high enough to cover the cost of the lien does not mitigate the damage caused by the title insurance company. At the time of the sale, the plaintiff's expectations were reduced by the amount of the lien.

Neither Bluff Ventures nor Industrial Bank stands for the proposition that, in the instant case, the plaintiffs damages should be calcu-

12

lated by the face value of the liens at the time of the foreclosure sale, instead of the cost of actually removing the liens. In Bluff Ventures and Industrial Bank, the plaintiff received as damages the face value of the lien because, in each case, the lien was valid and the face value of the lien was the cost of removing the lien. Neither case involved a situation where a lien encumbering the property at the time of the foreclosure sale turned out to be invalid or was settled for a lesser amount. In Bluff Ventures, however, we anticipated such a situation and qualified its holding accordingly; we stated that:

> when Bluff Ventures [the purchaser] failed to receive the subject matter of its purchase unimpaired by the judgment lien, it suffered a loss covered by the policy if the judgment is in fact determined to have been a valid lien on the property. The loss it suffered, if the lien was valid, was at least the amount necessary to pay off the prior lien.

Bluff Ventures, 950 F.2d at 143 (emphasis added).

We conclude that the proper measure of damages in this case is the cost of removing the liens from the property. Three of the six mechanics liens turned out to be invalid. The cost of removing the three valid liens, including attorneys fees, totalled $83,986.45. The district court correctly entered a judgment in that amount.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

13