**TYMSHARE, INC., Appellant,**

v.

**William J. COVELL.**

**William J. COVELL, Appellant,**

v.

**TYMSHARE, INC.**

**Nos. 82–2218, 82–2237.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1983.

Decided Feb. 7, 1984.

---

David S. Cohen, Washington, D.C., for appellant in 82–2218 and appellee in 82–2237. Andrew Mohr, Washington, D.C., also entered an appearance for Tymshare, Inc.

F. Lane Heard, III, Washington, D.C., for appellee in 82–2218 and cross-appellant in 82–2237.

Before EDWARDS and SCALIA, Circuit Judges, and LUMBARD,* Senior Circuit Judge for the United States Court of Appeals for the Second Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

In this diversity suit for breach of contract defendant Tymshare, Inc., appeals (No. 82–2218) from summary judgment finding that Tymshare violated its contractual obligation of good faith performance when it retroactively raised the commission quota of plaintiff William J. Covell, one of its sales representatives. Plaintiff cross appeals (No. 82–2237) from the district court's denial of prejudgment interest.

## I

Covell, a resident of Maryland, began to work for Tymshare, a California corporation which sells data processing services, in 1978. He was based in Tymshare's regional office in Virginia, where he agreed to the Compensation Plan that is the subject of this suit. His accounts included federal agencies in the District of Columbia, and the present dispute arose primarily out of his sales activities on behalf of Tymshare with regard to the United States Postal Service. We conclude from these factors that we have personal jurisdiction under the District of Columbia long-arm statute, D.C.CODE ANN. § 13–423(a)(1) (1981), that we have subject matter jurisdiction under 28 U.S.C. § 1332 (1976), and that the sub-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

stantive law of Virginia governs the issues of contract law before us.

Tymshare paid Covell on a salary-plus-commission basis. The exact amount of his compensation was determined with reference to the company's "Compensation Plan," under which sales representatives were entitled to commissions on all sales in excess of designated annual sales quotas. These commissions were to be paid monthly, on the basis of sales to date, and for that purpose each sales representative's annual quota was subdivided into (not necessarily equal) monthly quotas. If this system of commission payments were rigidly followed, however, an employee could surpass his year-to-date quota through one month and receive a payment, fall drastically below his year-to-date quota through the next month, and thus owe Tymshare for commissions previously paid. To lessen the likelihood of this occurrence, the Plan allowed Tymshare to hold a portion of each employee's accrued monthly commissions in a reserve account, which would be settled at year's end.

The following provisions of the Plan are of central importance here:

### I A

... This plan can be modified or terminated as set forth in Sections V and VI, within the sole discretion of the Division VP.

### II H(6)

All incentives recorded by the individual resulting from over 100% of new revenue performance by the sales representative shall be held in the reserve account. True performance and, therefore, true earned incentives are not known until year end. Due to large fluctuations in actual revenue that could result in a high percent of new revenue quota achievement early in the year, a reserve will be established. This reserve will tend to smooth payment of incentive monies during the course of the year. Monies held in reserve are not considered "earned" until the end of the quota period.... Sales Representative [sic] leaving their quota plan for any reason during the quota year will receive a portion of their reserve earned up to the last full month of employment *based on the rule of 78's payout.*

### V

Below are some examples of provisions under which adjustment to the quota plan may be made. This list is not exhaustive and management reserves the right to change the quota plan and individual quota and reserve payments at any time during the quota year within their sole discretion....

### VI A(3)

A Sales Representative whose employment is terminated will receive a statement of the individual's Commission account, accompanied by a check for commissions earned, up to and including the individual's last day of active work. However, reserve will be paid up to the last full month of employment, *based on the rule of 78's payout....*

### VI B

This plan shall terminate 12/31/80. However, in addition to any changes in quota that may be affected [sic] in accordance with Section V, "Modification to the Compensation Plan," Tymshare may terminate this plan at any earlier date. In its discretion, Tymshare may give thirty (30) days' notice of any modification in, or earlier termination of, this incentive plan. This notice provision applies only to those employees in good standing on the effective day of change or termination of this plan and does not in any manner create for any employee a right to such notice prior to the individual's termination of employment.

In 1979, Tymshare won a major contract to provide data processing services to the United States Postal Service, allegedly due in substantial part to Covell's sales efforts. At the beginning of 1980, Covell's sales

quota was set at $1.2 million,[1] based in large part on the expectation that the Postal Service contract to which he was assigned would produce substantial commissionable revenues that year. Covell's targeted earnings under the plan, given attainment of his quota and no more, were approximately $31,000.

Events in 1980 did not transpire as expected. The Postal Service was unable to convert to Tymshare's system as quickly as planned, and by the spring of 1980 those employees dependent on Postal Service revenues to meet their sales quotas expressed concern that the quotas were unreasonably high. Tymshare responded. Covell's quota was reduced to $815,000, which on the basis of the expectations then held, would produce the originally projected total earnings of approximately $31,000.

In the autumn of 1980 events again took an unexpected turn. Revenues from the Postal Service contract increased dramatically, far exceeding Covell's revised quota. (Total revenues from the contract in 1980 eventually exceeded the initial $1.2 million projection.) By the end of November, Covell's commissions alone already exceeded $30,000. Concerned with the amount of commissions Covell was accumulating, Tymshare withheld his September and October commission checks. On December 1, allegedly after he had questioned why he had not received those checks, Covell was told not to return to work. On December 9, Tymshare presented Covell with a revised quota plan, with the annual target figure

adjusted upward from $815,000 to the original $1.2 million. Tymshare effected this change by raising Covell's November quota from $135,200 to $487,600, and by lowering his December quota from $150,400 to $137,-000.[2] The change shifted the entire increase, and some of December's allotment as well, to November, thus erasing the year-to-date surplus which had existed at the end of November. Tymshare terminated Covell's employment contract on December 20, 1980.

Covell brought suit against Tymshare in March of 1981. The first count of the complaint sought compensatory and punitive damages for breach of the contractual obligation to compensate Covell pursuant to the 1980 Compensation Plan, by reason of Tymshare's failure to exercise its discretion under that Plan in good faith. The second and third counts sought compensatory damages for, respectively, discharge in breach of contract and wrongful discharge. Upon summary judgment motions, the district court entered judgment for the plaintiff on the first count, awarding $31,173.32 in compensatory damages. Thereafter, it granted the parties' joint motion to dismiss the plaintiff's remaining claims and the defendant's counterclaim (for breach of a nondisclosure agreement) with prejudice, making the prior order dispositive of the entire case.

The court acknowledged that the decision to revise the quota in December was "based on a reasonable management judgment

1. In June, Tymshare defined certain revenues not previously commissionable as subject to commission. Covell's first 1980 quota plan actually showed a quota of $515,000 which, under the modified accounting system, was equivalent to $1.2 million. To allow comparisons between different quotas, we, like the district court, have stated all quota figures on the basis of post-June commissionable revenue. *See Covell v. Tymshare, Inc.,* Civ. No. 81–571, slip op. at 2 n. 2 (D.D.C. July 14, 1982).

2. The reader may note (though the parties did not do so) that these changes in the monthly quotas do not add up to the $385,000 difference between the $815,000 and the $1.2 million annual quotas. The discrepancy traces itself to an error of addition in the December quota

plan, which shows as adding up to $1.2 million monthly quotas which in fact total $1.154 million. The error is perhaps understandable, since the object of the exercise was evidently to produce the originally contemplated $31,000 annual earnings. The figures relevant for that purpose, the *commission* figures for the twelve months, *were* added correctly.

Tymshare also met the problem of Covell's inflated earnings by granting the Postal Service credits that had the effect of reducing the commissionable billings for October and November by over $200,000. While appellee alluded to this in his Brief on Appeal, neither appellee in his complaint, nor the district court in its opinion, relied upon it as constituting a breach of contract.

that inaccurate revenue forecasts" had previously been relied upon, *Covell v. Tymshare, Inc.*, Civ. No. 81–571, slip op. at 4–5 (D.D.C. July 14, 1982); and further acknowledged that "the allocation of the quota increase to individual monthly quotas would normally have had no effect on the total amount of commission due since the commission is based on the amount by which total year-end revenues exceed the annual quota," *id.* at 5. In the circumstances of this case, however, the court found that "the timing of the quota increase and the manner in which the increased quota was applied to the individual monthly quotas ... raise[d] questions of bad faith and arbitrary action," *id.* It concluded that there was "clear and convincing evidence that defendant Tymshare demonstrated bad faith and arbitrary action in manipulating plaintiff's quota plan and terminating his employment in such a manner as to considerably reduce the commissions due him." *Id.* at 6.

## II

■ In this appeal, appellee has sought to justify the judgment below upon a ground argued below but not relied upon by the opinion of the district court. We may of course sustain on such a ground, *Langnes v. Green,* 282 U.S. 531, 538–39, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931), and because it is more readily disposed of we address this issue first. Appellee maintains that the finding of bad faith was correct because, to quote the heading of a section of his brief, "A Retroactive Quota Increase Is Contrary to the Purpose of the Tymshare Commission Plan and the Reasonable Expectations of the Parties." Brief for Appellee at 27. In other words (as appellee proceeds to argue), the retroactive increase was invalid even considered in isolation from the distinctive circumstances of Covell's case. If that is so, however, it represents not an invocation of the doctrine that acts permitted under a contract must be taken in good faith, but

application of the more rudimentary doctrine that acts not permitted under a contract must not be taken.[3] We proceed, then, to consider the real issue presented by appellee's argument: whether the contract permits retroactive quota increases.

■ We conclude that it does. The historical interpretation given to a contract by the parties is strong evidence of its meaning. *Coal Operators Casualty Co. v. C.L. Smith & Son Coal Co.,* 192 Va. 619, 626, 66 S.E.2d 521, 525 (1951); RESTATEMENT (SECOND) OF CONTRACTS § 202(5) (1981). While the interpretation given to the same contract by one of the parties in its dealings with third parties is not similarly persuasive, in a case such as this it has some weight—as demonstrating the past interpretation of at least one of the parties, and also suggesting the reasonableness of that interpretation since it has been accepted by others. It is uncontroverted that Tymshare has in the past made retroactive adjustments of employee quotas under its Compensation Plan.

■ We think, moreover, that the permissibility of such adjustment is the most plausible estimation of the contract's intent. The language, to begin with, is unqualified: "management reserves the right to change ... individual quota and reserve payments at any time during the quota year within their sole discretion." Section V, *supra.* And the evident purpose of the contractual scheme gives one to believe that—at least insofar as monthly quotas are concerned, and leaving aside for the moment the obligation of good faith—retrospective as well as prospective power was intended. What is at issue is not a retroactive adjustment of fully categorical entitlements, but rather a retroactive adjustment of estimated monthly quotas which, if substantially exceeded, produce reserves which, according to the contract, "are not considered 'earned' until the end of the quota period." It is clear from the contract that the *annual* quota

---

**3.** Ultimately, of course, every breach of contract reduces itself to this latter principle. As we shall discuss shortly, even the permissible act performed in bad faith is a breach only because acts in bad faith are not permitted under the contract. As an analytical matter, however, appellee's argument takes us away from the "good faith" rubric of the law.

(which indisputably can be changed, as it was here, before the end of the year) is the important measure, and the full-year sales the important performance. As the Compensation Plan said, "True performance and, therefore, true earned incentives are not known until year end." Section II H(6), *supra.* The monthly quotas were merely a means of spreading out the estimated annual compensation evenly over the course of the year. Any interpretation of the contract conducive to that end would seem the preferable one. The appellee's introduction of a limitation that is not in the language of the contract would not only frustrate the purpose of the monthly quota scheme (once the clearly permissible adjustment of the annual quota has been made) but it would compromise the power to adjust the *annual* quota in those cases where adjustment is most needed—enabling an employee in Covell's position to quit as soon as a substantial quota adjustment is announced, and to depart with windfall profits the quota adjustment scheme was designed to prevent.[4]

## III

We next address an argument urged by appellant, which is in effect the obverse of that just discussed. Appellant maintains that not only is retroactive adjustment not *always* impermissible under the contract, but it is *never* impermissible, no matter what the motive or intent. Appellant asserts that once we have acknowledged, as we have above, that retroactive increase is at least sometimes an allowable course of action, that is an end of the matter, since the Compensation Plan expressly gives Tymshare officers the right to determine that course of action "within their sole discretion." Section V, *supra.* Appellee responds by noting that "[t]he overwhelming majority of American jurisdictions ... recognize as a general principle of contract law the duty to perform a contract in good faith," Brief for Appellee at 17–18, citing a recent Harvard Law Review article to that effect, Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 HARV.L.REV. 369 (1980).

Unfortunately, neither of the parties has cited, nor have we been able to find, particularly pertinent Virginia authority on the existence of a generally applicable "duty to perform in good faith." Appellee cites *Nicely v. Bank of Virginia Trust Co.,* 221 Va. 1084, 277 S.E.2d 209 (1981), a suit for disability benefits under an employer's profit-sharing plan which provided that the decisions of the employer's Committee administering the plan "in all cases shall be final." In sustaining summary judgment for the defendant, the Virginia Supreme Court said that "the courts will not interfere with the administrator's decision ... unless there is clear and convincing evidence against the defendant of bad faith, fraud, mistake, or arbitrary action," *id.* at 1089, 277 S.E.2d at 212. Apart from the fact that this allusion to the relevance of bad faith was, since the action of the administrator was upheld, ultimately dictum, the opinion focused quite narrowly upon the particular sort of contract there at issue, as indicated by the first sentence of the court's legal analysis: "While we have not previously construed similar provisions of such a retirement and profit-sharing plan, there is ample authority from other jurisdictions on the subject." *Id.,* 277 S.E.2d at 211. *Nicely* does not suggest, even in dictum, a generally applicable duty to perform in good faith

---

4. The theory of plaintiff's complaint, and of the recovery he received, is that, but for the retroactive calculation of monthly quotas, he would have been entitled to retain all commissions calculated under the lower quota when he left in December. We confess some confusion on that point. The Compensation Plan provides that "Sales Representative [*sic*] leaving their quota plan for any reason during the quota year will receive a portion of their reserve earned up to the last full month of employment based on the rule of 78's payout." Section II H(6), *supra.* The Plan does not state what that portion might be, nor what the "rule of 78's payout" is. The Plan's specific provision for termination of employment is similarly puzzling, stating that "reserve will be paid up to the last full month of employment, *based on the rule of 78's payout.*" Since appellant has not directly contested this point, we assume that appellee's version of the consequences of mid-year termination is correct.

which limits expressly conferred contractual powers.

■ Ultimately, however, we think it unnecessary to speculate upon the Virginia Supreme Court's acceptance or rejection of the modern doctrine of "obligation to perform in good faith." That doctrine, it seems to us, is simply a rechristening of fundamental principles of contract law well established in Virginia and elsewhere. We agree with the observation of Professor Summers that the concept of good faith in the performance of contracts

> is an "excluder." It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.

Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 VA.L.REV. 195, 201 (1968) (footnotes omitted). Also correct, it seems to us, is the perception of Professor Farnsworth that the significance of the doctrine is "in implying terms in the agreement." Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.CHI.L.REV. 666, 670 (1963). When these two insights are combined, it becomes clear that the doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes "bad faith." In other words, the authorities that invoke, with increasing frequency, an all-purpose doctrine of "good faith" are usually if not invariably performing the same function executed (with more elegance and precision) by Judge Cardozo in *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917), when he found that an agreement which did not recite a particular duty was nonetheless " 'instinct with [ . . . ] an obligation,' imperfectly expressed," *quoting from McCall Co. v. Wright,* 133 A.D. 62, 68, 117 N.Y.S. 775, 779 (1909), *aff'd,* 198 N.Y. 143, 91 N.E. 516 (1910).[5] The new formulation may have more appeal to modern taste since it purports to rely directly upon considerations of morality and public policy, rather than achieving those objectives obliquely, by honoring the reasonable expectations created by the autonomous expressions of the contracting parties.[6] But it

---

5. Of course it may be that even when the contract does not contain any implicit restriction upon a contractual power, the law itself will impose one—just as it will eliminate certain contractual powers in their entirety as unlawful, for example, a penalty clause. *See* RESTATEMENT (SECOND) OF CONTRACTS § 356 (1981). This pertains, however, not to good faith in performance but to the legality of the performance that has been agreed to. The nonbreaching party who applies by its explicit terms a self-help provision that amounts to a penalty (*e.g.,* a provision expressly permitting the purchaser to keep all goods without payment if there is any defect) is performing the contract in the utmost good faith, but under a provision that is unlawful. *It is not conducive to sound analysis to* confuse the two concepts, as sometimes occurs, particularly where illegality on the basis of unconscionability is at issue. *See, e.g.,* CORBIN ON CONTRACTS § 654A at p. 660 (Kaufman Supp., 1982), which treats as one of the leading cases on the obligation of good faith an opinion which simply strikes down certain contractual provisions as unconscionable, *Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973),

*cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

6. See, for example, the latest revision of CORBIN ON CONTRACTS §§ 654A–I (Kaufman Supp.1982), which suggests that the contours of the doctrine of good faith performance are shaped by "the needs of commerce in particular, and society in general," *id.* at p. 664, and proceeds to mark out those contours by repeated allusion to "wise social policy," *id.* at p. 666, "unduly stifl[ing] society," *id.* at p. 668, and "social benefits (that) would be forfeited," *id.* at p. 670. Curiously, the text elsewhere asserts that the requirement of good faith aims at protecting "the reasonable expectations of parties," *id.* at pp. 657, 667. This simultaneous use of Cardozan analysis represents, as we have suggested, only an inconsistency of approach rather than of intended destination—since Cardozo and the common law assumed that "the needs of commerce in particular, and society in general" would ordinarily be met by holding people to the reasonable expectations that their autonomous expressions arouse.

seems to us that the result is, or should be, the same.

Many courts, including the Virginia Supreme Court, were wont to use "good faith" terminology—well before it acquired its more general application—in contracts involving obligations contingent upon personal satisfaction. There, as in its modern extension to the full range of contractual duties, the concept of good faith was a surrogate for an implied obligation or limitation. A Virginia case not cited by the parties, *Carpenter v. Virginia-Carolina Chemical Co.,* 98 Va. 177, 35 S.E. 358 (1900), involved a contract for the purchase and sale of a mineral called bone phosphate of lime, which was to be accepted in specified quantities at a specified price, "provided the defendant could use the same satisfactorily in its business," *id.* at 179, 35 S.E. at 358. The Virginia Supreme Court of Appeals reversed the trial court's failure to give the following instruction:

> [Y]ou are instructed that in determining whether the defendant could use the [mineral] satisfactorily it was bound to act fairly; and if you believe from the evidence that the defendant company did not act in good faith in declining to take the said rock, or if it declined to take the same because it could make better terms therefor with other persons, it is your duty to find for the plaintiffs.

*Id.* at 182, 35 S.E. at 359. The court disagreed with the trial court's assessment that "there was no evidence tending to make out the case supposed in the instruction," *id.* at 183, 35 S.E. at 360. In other words, it was implicit in the contract that whether the mineral could be used "satisfactorily" in the purchaser's business was to be determined by reference to its physical and chemical properties, and not its cost. The purchaser's use of the latter criterion for determining its satisfaction would violate that understanding, and therefore constitute "bad faith."

■ Whether pursued under the rubric of "good faith" or the more traditional rubric (for most contracts) of "implied limitation," the object of our inquiry is whether it was

reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust quotas could not be employed. If not, then appellant is correct that no action in this regard could constitute "bad faith"—or, as we would put it, there is no implicit contractual restriction.

■ In conducting this inquiry we must reject at the outset the proposition which appellant seeks to extract from certain cases to the effect that "[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct," *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773, 778 (S.D.N.Y.1969). *Accord Neuman v. Pike,* 591 F.2d 191, 195 (2d Cir.1979); *Automatic Sprinkler Corp. v. Anderson,* 243 Ga. 867, 868, 257 S.E.2d 283, 284 (1979). We have no doubt that proposition is correct (assuming that the provisions of the contract are not void as unconscionable, *see* note 5, *supra*) as an elaboration of the fundamental principle, set forth in another case cited by appellant, that "[w]hat the intent of the parties was in making the contract must control; it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." *MacDougald Construction Co. v. State Highway Department,* 125 Ga.App. 591, 594, 188 S.E.2d 405, 407 (1972). But the trick is to tell *when* a contract has been so drawn—and surely the mere recitation of an express power is not always the test. Sometimes it may suffice, depending upon the nature of the expressed power. We cannot imagine, for example, entertaining a claim that a demand for payment of a demand note has been made "in bad faith." In the understood nature of human arrangements, a loan of money in exchange for a promise to repay on demand does not import an obligation to make the demand only if the money is really needed, or only without the purpose and effect of inconveniencing the obligor. But to say that every expressly conferred contractual

power is of this nature is virtually to read the doctrine of good faith (or of implied contractual obligations and limitations) out of existence. Many cases, for example, place "good faith" limitations upon the reasons for which an express power to terminate a contract "at will" can be exercised, *see, e.g., Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). (One application of this principle has been embodied in the RESTATEMENT (SECOND) OF AGENCY § 454 (1958).) And in much earlier times, before the "good faith" terminology was generally applied, the same principle was employed to find that an unqualified option to terminate if a specified event occurs "clearly implied" that the option had to be exercised within a reasonable time after the happening of the event. *Davidson Hardware Co. v. Delker Bros. Buggy Co.,* 170 N.C. 298, 300, 86 S.E. 958, 959 (1915); *see generally* Annot., 164 A.L.R. 1014, 1024–26 (1946).

▮▮▮ Here, however, appellant does not rely solely upon the express conferral of a power to alter quotas, but also upon the expansive fashion in which that power is contractually described. The Compensation Plan states and reiterates that Tymshare may change the quota plan "within [its] sole discretion," Sections I A, V, *supra.* But as the administrative law concept of "abuse of discretion" suggests, *see* 5 U.S.C. § 706(2)(A) (1982), this phrase is not necessarily the equivalent of "for any reason whatsoever, no matter how arbitrary or unreasonable." As applied to some contractual powers, it may indeed connote the sort of unfettered authority appellant would wish. But just as, as discussed above, certain express powers, even without an expansive modifier, are implicitly absolute (the power to call a demand note) while others are not (the power to terminate certain continuing contractual arrangements); so also, the reasonably understood effect of an expansive modifier varies from case to case depending upon the nature of the power at issue. Where what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract—a large part of the *quid pro quo* that induced one

party's assent—it is simply not likely that the parties had in mind a power quite as absolute as appellant suggests. In the present case, agreeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available. It seems to us that the "sole discretion" intended was discretion to determine the existence or nonexistence of the various factors that would reasonably justify alteration of the sales quota. Those factors would include (as the company's practice under the provisions bears out) an unanticipated volume of business from a particular customer unconnected with the extra sales efforts of the employee assigned to that account; and they may perhaps include other eventualities, such as a poor overall sales year for the company, leaving less gross income to be expended on commissions. The company's genuine determination that one or another of these factors exists can presumably not be questioned. But the language need not (and therefore can not reasonably) be read to confer discretion to reduce the quota for any reason whatever—including what Covell has alleged here, a simple desire to deprive an employee of the fairly agreed benefit of his labors.

### IV

Having rejected both appellee's contention that no retroactive quota adjustments were permissible under the contract, and appellant's contention that all were permissible, we finally confront the basis on which the trial court granted summary judgment: that under the particular circumstances of this case Tymshare had broken its contract by "manipulating plaintiff's quota plan and terminating his employment in such a manner as to considerably reduce the commissions due him." *Covell v. Tymshare, Inc., supra,* slip op. at 6.

▮▮▮ We take this to mean that in using its quota adjustment authority (combined with its termination authority) to reduce Covell's compensation, Tymshare was not acting for any of the purposes implicitly

envisioned by the contract. As our earlier discussion suggests, we agree that this would be a proper basis for judgment against Tymshare. The only question remaining, then, is whether there was adequate evidence to support it. Since this appeal is from a summary judgment, we must view the record in the light most favorable to Tymshare, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and can sustain the judgment only if a reasonable person could come to no factual conclusion other than that reached by the district court. *National Association of Government Employees v. Campbell,* 593 F.2d 1023, 1027 (D.C.Cir.1978).

The district court found (as there was assuredly ample evidence to support) that "[t]he decision to change the quota back to $1.2 million was based on a reasonable management judgment that inaccurate revenue forecasts had been used earlier to lower the quota to $815,000." *Covell v. Tymshare, Inc., supra,* slip op. at 4–5. Since the district court further found (again supported by the evidence) that the retroactive application of the quota increase "would normally have had no effect on the total amount of commission," and only did so here because "plaintiff's employment was terminated prior to the end of the year," *id.* at 5; it follows that Tymshare's pursuit of an impermissible purpose in the retroactive increase assumes an intent, at the time of that increase, to terminate Covell's employment before year's end. The record contains no explicit indication of such an intent. While a jury might be permitted to infer it from the circumstances (a point we do not now address), such an inference is surely not inevitable and is therefore not proper ground for a summary judgment.

An alternative hypothesis that would sustain judgment for the plaintiff is that— even though no intent to terminate existed at the time the retroactive increase was effected, so that the increase itself was valid—the *termination* was in violation of implied contractual limitations upon the purposes for which *that* power could be exercised. *See Fortune v. National Cash Register Co., supra.* Just as it is unlikely

that the parties to this contract intended to confer upon Tymshare the power to use its quota-adjustment authority for the purpose of depriving a sales representative of reasonably contemplated compensation; so also it is unlikely that they intended to enable it to use the *termination* authority for the same purpose *after* a valid quota increase. This, however, is not the rationale that the district court used, and indeed is a rationale properly applicable to Count II of the complaint, which the judgment did not address. Nor can the evidence be read to demonstrate beyond reasonable doubt that deprivation of compensation was the purpose of the termination.

Since the case must, therefore, be remanded, we may note for the district court's benefit our puzzlement with regard to the amount of damages awarded. If the retroactive quota increase in isolation was legitimate, and it was only that *in combination with* the simultaneously contemplated termination that constituted the breach, then the correct amount of damages under Count I would appear to be not (what the district court awarded) the full amount of denied commission compensation attributable to the increase-with-termination, but rather the difference between the commissions paid and the commissions that would have been paid if there had been a quota increase without termination. Since, as described earlier, even if the quota increase had been purely prospective it would have caught up with Covell at the end of the year to erase prior monthly commissions, award of the full commissions owing before the retroactive adjustment would seem wrong. Indeed, unless the commissions already paid to Covell, or those already due before the adjustment (and not subject to being held in reserve), exceeded the adjusted year-end commissions due; and unless the contract prevented recapture of funds already paid or prevented any prospective adjustment that would reduce commissions below the level not subject to being held in reserve (points on which we express no opinion); the quota increase would appear to produce no damages at all.

Finally, we note several limitations upon the scope of this opinion:

(1) While we hold, as a matter of law, that this contract permits quota increases, and even retroactive quota increases, to adjust for an unexpectedly high volume of sales not attributable to the special efforts of the sales representative, we do not hold that the increase here was of that nature. The district court expressed its view that that was the case, *Covell v. Tymshare, Inc., supra,* slip op. at 4–5, but that expression was made in the context of a summary judgment motion requiring the facts to be viewed in the light most favorable to the defendant. On remand, the district court remains free to determine whether that issue should go to the jury; we express no view either way.

(2) Nothing we have said bears upon damages attributable to discharge in breach of contract (Count II of the complaint) and to wrongful discharge (Count III). Since those counts have been voluntarily dismissed, we express no views on that issue, nor do we consider whether an action for wrongful termination lies under Virginia law, or even whether Virginia law governs that contract-related tort claim.

For the reasons stated, the judgment of the district is

*Reversed and Remanded.*