36 F.3d 370
 The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Plaintiff-Appellee,
v.
Samuel A. LINCH; Marcia Penny Linch, Defendants-Appellants.
Samuel A. LINCH; Marcia Penny Linch; Albert C. Randolph,
Plaintiffs-Appellants,
and
McKenney Farm Associates Limited Partnership; Smith Farm
Associates Limited Partnership; Shell Farm Associates
Limited Partnership; Marsh Farm Associates Limited
Partnership; Linch Group Properties Limited Partnership, Plaintiffs,
v.
The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Defendant-Appellee.
 No. 93-2049.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 12, 1994.
Decided Sept. 27, 1994.
 
 1
 ARGUED: Dennis Arnold Davison, David & Hagner, P.C., Washington, DC, for appellants. Deborah Brand Baum, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for appellee. ON BRIEF: Michael L. Shor, Sharon L. Terry, David & Hagner, P.C., Washington, DC, for appellants. David G. Fiske, Teresa L. Diaz, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for appellee.
 
 
 2
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 
 3
 Affirmed by published opinion. Senior Judge HARVEY wrote the opinion, in which Judge MURNAGHAN and Judge NIEMEYER joined.
 
 OPINION
 ALEXANDER HARVEY, II, Senior District Judge:
 
 4
 Between 1986 and 1991, appellee The Riggs National Bank of Washington, D.C. ("Riggs") made a series of loans to four limited partnerships (the "Borrowers") which had been formed by appellants Samuel A. Linch and Albert C. Randolph. The sums loaned were to be used to finance the acquisition and development of certain real property located in Gainsville, Virginia. Eventually, these loans were renegotiated and consolidated into a single note (the "Note") in the principal amount of $11,182,800, due and payable to Riggs on or before October 1, 1991. Under the terms of the Note, the Borrowers were charged interest:
 
 
 5
 at an adjustable annual interest rate, adjusted daily, which is determined by adding three (3) percentage points to the "Riggs Prime Rate," but in no event to exceed fifteen percent (15%). The Riggs Prime Rate shall mean the rate of interest established from time to time and publicly announced by [Riggs], in its sole discretion, as its then applicable prime rate of interest to be used as an index in determining actual interest rates to be charged to certain customers of [Riggs], adjusted daily when and as such rate is changed.
 
 
 6
 In the course of these transactions, appellant Samuel Linch, his wife Marcia (also an appellant), and appellant Randolph (collectively, "the Guarantors") each executed an unconditional personal guaranty of the Note. The Guarantors "jointly and severally, absolutely and unconditionally guarantee[d] the full and prompt payment" of the balance due on the Note at maturity, including principal, interest, fees and other charges.
 
 
 7
 When Linch and Randolph first sought a loan from Riggs, each of them was required to furnish a personal financial statement. The financial statements submitted by them with their initial formal loan proposal indicated that Linch had a net worth of approximately $2.3 million and that Randolph had a net worth of approximately $14.7 million. However, without so stating, Linch's personal financial statement included substantial assets which Linch owned jointly with his wife. When Riggs on November 14, 1986 approved this first loan request, it did not know that some of the assets listed on Linch's personal financial statement were jointly owned. Initially, Riggs had required that only Linch and Randolph each execute a personal guaranty in the principal amount of the approved loan. Their respective spouses had not been required to do so.
 
 
 8
 Prior to closing, Riggs learned that many of the significant assets listed on Linch's personal financial statement were in fact jointly owned by Linch and his wife. As a condition of the loan, Riggs therefore required that Marcia Linch also execute a personal guaranty.[1] Subsequently, additional loans were made to Linch and Randolph. On each occasion, personal guaranties were required and were executed by Samuel Linch, by Marcia Linch and by Randolph. As finally renegotiated and consolidated, the Note was in the principal amount of $11,182,800.
 
 
 9
 On October 1, 1991, the borrowers defaulted, and Riggs filed suit against the Linches in the United States District Court for the Eastern District of Virginia, seeking to recover, based on the guaranties which the Linches had executed, the balance due plus interest and other charges. The Linches, Randolph, and the Borrowers responded by filing a separate action in a state court against Riggs, seeking rescission of the guaranties and damages.[2] In that action, it was alleged that Riggs had violated the Equal Credit Opportunity Act (the "ECOA"), 15 U.S.C. Sec. 1691 et seq., by requiring Marcia Linch to execute a personal guaranty of the Note solely because of her status as Samuel Linch's wife and without regard to the independent creditworthiness of Samuel Linch. The Guarantors also alleged claims against Riggs in that suit for breach of contract, breach of an implied duty of good faith and fair dealing, fraud, breach of fiduciary duty, and duress.
 
 
 10
 Riggs then removed the state court suit to the federal district court, filed a motion to consolidate the removed action with the suit earlier filed by Riggs against the Linches, and filed a counterclaim against Randolph, seeking to recover on his guaranty. The district court granted Riggs' motion to consolidate, and the two cases were consolidated for all purposes, including trial.
 
 
 11
 Thereafter, Riggs filed a motion under Rule 12(c), F.R.Civ.P., seeking partial judgment on the pleadings as to the Guarantors' claims against Riggs for breach of an implied duty of good faith and fair dealing. In an oral opinion rendered in open court on January 8, 1993, the district court treated Riggs' motion as one for partial summary judgment, and entered judgment in favor of Riggs on those claims.[3]
 
 
 12
 On March 15, 1993, these consolidated cases came on for trial before the district court, sitting without a jury. By that time, only two sets of claims remained: (1) Riggs' claims against each of the Guarantors to recover on their guaranties; and (2) the Guarantors' claims against Riggs for violating the ECOA.
 
 
 13
 Following a two-day trial, the district court issued its Memorandum Opinion on August 3, 1993, determining that Riggs was entitled to judgment against the Guarantors, 829 F.Supp. 163. The Court concluded that Riggs had not violated the ECOA in any of its transactions with the Linches and that Randolph had no standing to sue under the statute. Alternatively, the district court ruled that, even if the Guarantors could establish that Riggs had violated the ECOA, they would not in any event be entitled to the relief which they sought, because an ECOA violation could not be raised as an affirmative defense to Riggs' claim against the Guarantors based on the personal guaranties executed by them.[4]
 
 
 14
 On August 8, 1993, the district court entered a final judgment against the Guarantors, jointly and severally, in the amount of $13,439,151.93. This appeal followed.
 
 
 15
 Because we conclude that there was substantial evidence to support the district court's findings and verdict, and because we find no merit to any of appellants' other assignments of error, we affirm.
 
 
 16
 * Appellants first argue that the district court erred in granting partial summary judgment to Riggs on the Guarantors' claims for breach of an implied duty of good faith and fair dealing. Relying principally on Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C.Cir.1984), appellants argue that Riggs' discretion to set its own prime rate was limited by an implied duty of good faith in the performance of the Note. According to appellants, Riggs breached this implied duty when it arbitrarily refused to lower its prime rate in December of 1990 after the Federal Reserve had cut its discount rate and after other commercial institutions had lowered their prime rates.
 
 
 17
 There is no merit to these arguments. An implied duty of good faith cannot be used to override or modify explicit contractual terms. See, e.g., General Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1041 (6th Cir.1990); Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672, 679 (2d Cir.1985). Under the explicit terms of the Note at issue here, interest accrued on the outstanding principal at a rate equal to Riggs' prime rate plus three percentage points. Although the rate of interest charged under the Note was subject to a "ceiling" of fifteen percent, the Note explicitly recognized that Riggs had the "sole discretion" to set its prime rate and that "the Riggs Prime Rate is not necessarily the lowest or most favorable rate of interest charged by [Riggs] on loans to its customers." Furthermore, the Note expressly stated that the Borrowers had "requested the Riggs Prime Rate be used as the interest rate index for this Note." Under these circumstances, it cannot be disputed that the Note conferred upon Riggs the sole discretion to set its own prime rate and that no implied duty of good faith can be relied upon for a renegotiation of the terms of the Note.
 
 
 18
 Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C.Cir.1984), relied upon by appellants, is not to the contrary. In that case, the District of Columbia Circuit Court of Appeals held that under Virginia law[5] an implied duty of good faith may place some limitations upon the otherwise unfettered discretion of one party to a contract to determine the extent of the other party's contractual obligations. Writing for a unanimous panel, Judge (now Justice) Scalia emphasized that "the doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes 'bad faith.' " Id. Thus, "the object of our inquiry is whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust [the prime rate] could not be employed." Id.
 
 
 19
 Under the circumstances here, the Borrowers could not have had a reasonable expectation that Riggs' discretion to set its own prime rate would be constrained by the ebb and flow of other commercial or governmental rates of interest. Indeed, Tymshare is inapplicable here precisely because the Note at issue in this case, unlike the contract at issue in Tymshare, did not confer an unfettered discretion upon one party to determine the extent of the other party's contractual obligations. Rather, Riggs' discretion to set the interest rate charged under the Note was expressly "fettered" by the bargained for limitation that the interest charged under the Note would not exceed 15 percent.[6]
 
 
 20
 Moreover, the issue concerning the parties' intent, so crucial to the Court's holding in Tymshare, is controlled here by the clear and unambiguous terms of the Note. Appellants have not challenged in this appeal the district court's finding that the Note was a complete and unambiguous expression of the parties' intent. Under applicable Virginia law, where a contract is clear and unambiguous on its face, a court need not, indeed may not, search beyond the terms of the contract to extract its meaning. E.g., Lerner v. Gudelsky Co., 230 Va. 124, 334 S.E.2d 579, 584 (1985); Amos v. Coffey, 228 Va. 88, 320 S.E.2d 335, 337 (1984).
 
 
 21
 Accordingly, we affirm the district court's granting of partial summary judgment in favor of Riggs on the Guarantors' claims for breach of an implied duty of good faith.
 
 II
 
 22
 Appellants next contend that the district court erred in concluding that Riggs did not violate the ECOA by requiring Marcia Linch to execute a personal guaranty of the Note. More specifically, appellants argue that it was error for the district court to find that Riggs required Marcia Linch to be a guarantor only after it had determined that Samuel Linch was not independently creditworthy for the amount of the loan involved. After a review of the evidence of record below, we find no error.
 
 
 23
 It is well-established that the ECOA, 15 U.S.C. Sec. 1691 et seq., and its implementing regulations, 12 C.F.R. Sec. 202.1 et seq., prohibit a creditor from requiring a spouse's signature on a note when the applicant individually qualifies for the requested credit. See, e.g., Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir.1982). Specifically, the ECOA provides that it "shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, ... on the basis of ... marital status...." 15 U.S.C. Sec. 1691(a). The regulations implementing the ECOA further provide that "a creditor shall not require the signature of an applicant's spouse ..., other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness or the amount and terms of the credit requested." 12 C.F.R. Sec. 202.7(d)(1).
 
 
 24
 In applying these provisions to the facts of record here, the district court properly recognized that the determinative factual issue was whether Riggs had made a determination that Samuel Linch was not independently creditworthy for the requested loan before it required that Marcia Linch also be a personal guarantor of the loan. After hearing testimony and receiving evidence at the trial, the district court found as a fact that Riggs did not require Marcia Linch to be an additional guarantor until after it had learned that Samuel Linch did not individually own many of the substantial assets which he had listed on the "personal" financial statement submitted by him to Riggs with the original loan application. There is little doubt that Samuel Linch failed to inform Riggs that many of the assets listed in his personal financial statement were jointly owned by him and his wife. The district court further found that Riggs had properly made a contemporaneous determination that Samuel Linch was not independently creditworthy for the amount of the requested loan, and that it was only after this determination was made that Riggs requested that Marcia Linch also be a guarantor of the loan.
 
 
 25
 There is ample evidence in the record to support each of these findings. Although the Linches have attacked the reliability and accuracy of certain testimony and other evidence presented at the trial, such matters were for the district court, as the finder of fact, to determine. The arguments advanced provide no basis for this Court to overturn the district court's finding that Riggs did not discriminate against Marcia Linch on the basis of her marital status. Riggs therefore did not violate the ECOA in its dealings with the Guarantors.
 
 
 26
 Nor did the district court err in ruling that Randolph lacked standing to assert an ECOA claim against Riggs. Riggs did not require Randolph's spouse to be a guarantor of the Note. Accordingly, Randolph is not an "aggrieved applicant" within the meaning of the ECOA, and he therefore cannot bring suit in his own name under that statute. See 15 U.S.C. Secs. 1691a(b), 1691e(a). Moreover, Randolph would not be entitled to base his ECOA claim on alleged violations of the ECOA insofar as Marcia Linch was concerned. As stated hereinabove, Riggs did not violate the ECOA by requiring Marcia Linch to be a guarantor of the Note.
 
 
 27
 Finally, because we conclude that the district court did not err in finding that Riggs did not violate the ECOA in any of its dealings with appellants, we need not reach the issue whether an ECOA violation by a creditor can properly be raised by the debtor as an affirmative defense in the nature of an avoidance or rescission of the underlying debt.[7]
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 Randolph was able to satisfy Riggs that he individually owned all of the assets listed on his financial statement, and his wife was not therefore required to execute a guaranty
 
 
 [2]
 Prior to trial of these consolidated actions, each of the Borrowers went into involuntary bankruptcy, and all claims against them were stayed pursuant to 11 U.S.C. Sec. 362. Subsequently, the claims of and the counterclaims against the Borrowers were dismissed by the district court
 
 
 [3]
 Riggs later filed a motion for summary judgment, which the district court granted in part, dismissing all of the Guarantors' remaining claims against Riggs other than the ECOA claims. The Guarantors have not challenged that ruling in this appeal
 
 
 [4]
 The district court also concluded, in the alternative, that the Guarantors' claimed damages were too speculative
 
 
 [5]
 The parties agree that Virginia law controls here
 
 
 [6]
 We do not agree with appellants' characterization of this interest rate ceiling as an insignificant limitation. At the time of the execution of the Note, Riggs' prime rate was already at 10 percent. Since the Note calls for interest to be charged at three percentage points above Riggs' prime rate, Riggs was precluded by the 15 percent ceiling from raising the interest rate by any more than two percentage points
 
 
 [7]
 Other arguments advanced by the appellants, some of which have been raised for the first time in this appeal, are similarly without merit