NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-4586

_____

DYNAMIC SECURITY CONCEPTS, INC.,

Petitioner

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent

_____

On Petition for Review from an
Order of the Federal Aviation Administration
(Agency No. 07-ODRA-00428)

_____

Submitted Under Third Circuit LAR 34.1(a)
October 19, 2010

Before:  HARDIMAN, GREENAWAY, JR., and NYGAARD, *Circuit Judges*.

(Filed: November 30, 2010)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Dynamic Security Concepts, Inc. (DSCI) petitions for review of an order of the

Federal Aviation Administration (FAA) rejecting DSCI's claim that the FAA's William J.

Hughes Technical Center (Tech Center) breached its duty of good faith in the

administration of a contract with DSCI. We will affirm, largely for the reasons articulated by the FAA's Office of Dispute Resolution for Acquisition (ODRA).

I.

Because we write for the parties, we recount only the essential facts.

A.

"DSCI is a woman-owned small business focused on systems engineering, test and evaluation, human factors engineering, information security, process improvement, and program and data management for government agencies." DSCI: DYNAMIC SECURITY CONCEPTS, INC., http://s318678554.onlinehome.us/ (last visited Oct. 4, 2010). In June 2000, the FAA awarded DSCI an indefinite duration/indefinite quantity (IDIQ) contract, which called for a minimum purchase of $400,000 in services "continu[ing] in effect for 60 months dependent on funding received." J.A. at 2429. The contract was administered via "delivery orders," the first of which was issued at the same time as the contract, satisfying the FAA's $400,000 minimum obligation. DSCI was tasked with developing, testing, and implementing improvements to Tech Center computer software development processes, as well as assisting with aviation security. The record indicates that DSCI performed these tasks well and served the Agency capably, notably providing assistance on September 11, 2001. By the end of five and a half years—the contract having been extended six months—the FAA had issued ten delivery orders and committed over $14 million to DSCI.

DSCI and its President, Susan Hopkins, interacted with a number of Tech Center employees, each of whom had a different approach to administering the contract. The Contracting Officer Technical Representative (COTR)—the Tech Center employee charged with most closely overseeing the contract—changed several times during the life of the contract. For the first three years, Donna DiPasquale and Diane Schuman served as COTRs and were pleased with DSCI's work. In May 2003, Schuman was replaced by Michael Virga, who served as COTR until November 2004. The record indicates that Hopkins's and Virga's relationship was strained and that Hopkins objected to the way Virga scrutinized DSCI's tasks and performance. Hopkins also clashed with Virga's supervisor, Vincent Tran, who along with his own supervisor, Bernard Hanlin, had chosen Virga as Schuman's successor.

Under Tran and Virga, the administration of the DSCI contract became contentious on several fronts:[1]

> Pursuant to Delivery Order 1, DSCI provided the Tech Center with "administrative support" personnel to assist with the Display System Replacement Program, which dealt with improving automated tracking systems for air traffic controllers. Upon learning that DSCI's "administrative assistants" were performing "secretarial" tasks that were outside the scope of the Delivery Order, Virga recommended that the Tech Center allow the Delivery Order to expire, at which time the DSCI workers could be reassigned under a more appropriate contract. Hopkins objected to the "termination" of the initial Delivery Order.

---

[1] The following represents one of many plausible versions of the facts. The record is rife with factual disputes, but at this stage of the proceedings, facts found by the agency, "if supported by substantial evidence, are conclusive." 49 U.S.C. § 46110(c).

3

Delivery Order 5 tasked DSCI with addressing the FAA's computer security risk and remediation plans, known as "SCAP." DSCI successfully handled SCAP for almost three years before Tran reallocated much of the work to another contractor. Later, Tran contracted DSCI to serve in a "quality control" capacity. Hopkins objected to the reassignment, in part because some of the SCAP work taken from DSCI was purportedly committed to DSCI pursuant to an oral agreement between Hopkins and Tran to establish a joint off-site facility to be shared by DSCI and the Tech Center.

Delivery Order 6 required DSCI to develop and conduct National Operational Laboratory Suitability Studies (NOLSS) and Testing and Evaluation (T&E) Gold Standards, which entailed ensuring that equipment in testing labs was identical to equipment actually used by the FAA and creating a list of best practices for introducing new software. Several months into DSCI's work on the NOLSS-T&E Gold project, Virga (in his pre-COTR role) advised his superiors about DSCI's ability to meet the Tech Center's needs, and those superiors decided to reassign the work to another contractor and subcontractor: Computer Technology Associates, Inc. (CTA) and Programmatix, Inc. Several months after the contract was awarded to CTA/Programmatix, Programmatix hired Virga's roommate, Jefferson Heller. Again, Hopkins protested the reduction in DSCI's work under the contract.

Under Delivery Order 8, DSCI was forced to transition from being a prime contractor for the FAA to a subcontractor for the Department of Homeland Security—a demotion that Virga could potentially have prevented had he taken steps to allow DSCI to maintain its prime contractor status. Hopkins claims that Virga's failure to do so harmed DSCI because it deprived the company of higher rates and other benefits associated with being a prime contractor for the government.

The record indicates that while these disputes over contract administration were transpiring, DSCI/Hopkins and Tran/Virga engaged in a tit-for-tat squabble with millions of taxpayer dollars caught in the middle. Hopkins alleges that Tran and Virga repeatedly threatened to take work from DSCI because of personal animosity and professional jealousy. Tran and Virga allege that Hopkins carried on an unprofessional friendship

4

with COTR Schuman, which resulted in unreasonable expectations about how the contract should be administered. Hopkins alleges that Virga was unqualified to be COTR and that he and Tran engaged in aggressive, retaliatory tactics that intimidated other FAA employees. Tran and Virga allege that DSCI misappropriated funds and assumed tasks beyond the scope of its contract. In the end, both Virga and Tran were removed from their positions because of concerns about their management—Virga allegedly because of a conflict of interest and Tran because of his poor leadership style—and DSCI's contract was allowed to expire.

Several third parties attempted to investigate and shed light on the apparently dysfunctional workings within the FAA Tech Center. In April 2003, Deborah Williams conducted an inquiry into complaints that Tran and Virga were unprofessional and abusive to coworkers. Williams's report confirmed that several FAA employees found Tran's and Virga's workplace behavior to be inappropriate or offensive. In November 2003, DSCI implored New Jersey Congressman Frank LoBiondo to examine the situation, which he did, resulting in a letter to the FAA Administrator requesting a formal agency investigation. The Department of Transportation Office of Inspector General (DOT-IG) looked into the matter and found that Tran and Virga did nothing wrong in diverting work away from DSCI. Both of these final reports (i.e., Williams's and the DOT-IG's), as well as the correspondence of Congressman LoBiondo, were presented to

5

ODRA during its hearing.[2]

B.

On April 14, 2005, DSCI filed a complaint with ODRA alleging that the Tech Center administered the contract in bad faith. In September 2007, after seventeen depositions and three days of hearings with nine witnesses, ODRA issued its Findings and Recommendations (F&R), which concluded that DSCI's claims were without merit.

ODRA's major findings were as follows. DSCI's close relationship with COTR Schuman resulted in the company's flawed understanding of how FAA contracts are administered and created unreasonable expectations about the amount of work to which DSCI was entitled under its particular contract. Hopkins's opposition to any oversight more exacting than Schuman's "generally everything was preapproved" approach, J.A. at 1602, led to conflicts with Virga and Tran. Virga was a credible witness, and he testified that his goal as COTR was to bring rigor to the DSCI contract, not harm DSCI or Hopkins. Conversely, Hopkins and several other DSCI witnesses were not credible because the record contained evidence of personal bias and self interest. ODRA concluded by noting that although the contract entitled DSCI to receive work valued at $400,000, the company received more than $14 million; all of DSCI's delivery orders expired under their own terms; and Tran, Virga, and all other Tech Center employees had

---

2 Williams's complete file was not turned over to DSCI during discovery. Although the FAA's failure to do so is troubling, it is immaterial for the reasons explained in Part II.B, *infra*.

6

legitimate business reasons for assigning work to contractors other than DSCI. Based on these facts and a review of the extensive record, ODRA recommended the FAA deny DSCI's claim for breach of contract.

FAA Order Number ODRA-07-428 adopted ODRA's F&R in full and denied DSCI's claim. This appeal followed.[3]

II.

The crux of DSCI's argument is its allegation that the FAA Order violated the Administrative Procedure Act.[4] Section 706 of the APA requires us to "set aside agency

3 ODRA's authority to adjudicate this matter is found in 49 U.S.C. § 40110(d). We have jurisdiction pursuant to 49 U.S.C. § 46110, which states that a party with an interest in an FAA order "may apply for review of the order by filing a petition for review in . . . the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." DSCI's principal place of business is Mays Landing, New Jersey.

4 DSCI also raises two threshold legal questions. We need not address them at length, however, as neither materially affects the outcome of this case. First, DSCI argues that the implied covenant of good faith obligates the government to fairly consider for future work any contractor with which it has an IDIQ contract because such an agreement as the one in this case creates a reasonable expectation that the contractor will be able to fairly compete for work throughout the life of the contract. We have not had occasion to decide this question, and authority from other jurisdictions raises some uncertainty as to whether such a covenant exists in IDIQ contracts. *Compare Travel Centre v. Barram*, 236 F.3d 1316, 1319 (Fed. Cir. 2001) (holding that "less than ideal contracting tactics" do not constitute a breach of an IDIQ contract as long as the parties have satisfied their minimum obligations), *and Mason v. United States*, 615 F.2d 1343, 1347 (Ct. Cl. 1980) (stating that IDIQ contracts contain only two express terms: a "promise[] to order whatever amount of services it cho[oses] to" and a "Guaranteed Minimum Quantity clause assur[ing] a minimum purchase amount"), *with Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (finding that a contract term granting one party "sole discretion" is limited by the doctrine of good faith so the party does not have "unfettered authority" to act "for any reason whatsoever, no matter how arbitrary or

7

action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; . . . [or] (E) unsupported by substantial evidence."  5 U.S.C. § 706(2); *see also* 49 U.S.C. § 46110(c) ("Findings of fact . . . if supported by substantial evidence, are conclusive.").  "Agency action may not be set aside on grounds that it is arbitrary and capricious if the action is rational, based on relevant factors, and within the agency's statutory authority."  *Frisby v. HUD*, 755 F.2d 1052, 1055 (3d Cir. 1985).  Evidence is "substantial" if it is more than a mere "scintilla" and "do[es] more than create a suspicion of the existence of the fact to be established."  *Lusingo v. Gonzales*, 420 F.3d 193, 199 (3d Cir. 2005) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)).  Credibility determinations are likewise treated as facts to be assessed under the same standard.  *Gao v. Ashcroft*, 299

unreasonable" because "agreeing to such a provision would require a degree of folly" by the other party that the court was "not inclined to posit").  Even if we accept DSCI's good faith argument, the record indicates that the Tech Center must have at least implicitly considered DSCI for the work in question (i.e., NOLSS-T&E Gold and SCAP assignments) because DSCI was already performing those tasks.  Tran and Virga could not have simultaneously taken work from DSCI and not considered whether DSCI should do it.  Moreover, the F&R analyzes the entire administration of the contract, including the Tech Center's good faith consideration of DSCI for future work.  To the extent that DSCI believes it should have been chosen for individual assignments, that goes beyond the scope of any potential covenant of good faith, as explained in the F&R.

Second, DSCI asserts that ODRA improperly applied a presumption of good faith on the part of the government, thus requiring DSCI to present "well nigh irrefragable" evidence of bad faith.  Even assuming the "well nigh irrefragable" standard does not apply when the government is acting as party to a contract, ODRA made clear in its F&R that it found DSCI unable to meet even a lower "preponderance of the evidence" standard of proof.  F&R at 113, J.A. at 161.

F.3d 266, 272 (3d Cir. 2002), *superseded on other grounds by statute as stated in Kaita v. Att'y Gen.*, 522 F.3d 288, 295–97 (3d Cir. 2008).

A.

We note at the outset that ODRA's detailed F&R is imperfect, and DSCI ably points out several inconsistencies between the record and ODRA's findings. At various points, the F&R mischaracterizes the record and arrives at erroneous or impossible factual conclusions. For instance, ODRA indicates that replacing Schuman with Virga as COTR was justified because "[a]s early as October 24, 2001, [the Administrative Contracting Officer] expressed concerns to Mr. Tran and others about the performance of Ms. Schuman as COTR on the Contract and requested that [the Agency] identify a different COTR to handle task orders." F&R at 51, Finding of Fact 168, J.A. at 99. As DSCI notes, the record indicates that Schuman did not assume the role of COTR until December 14, 2001, almost two months after there was supposedly concern about her performance in that position. F&R at 16, Finding of Fact 49, J.A. at 64. Later, ODRA implies that Hopkins engaged in unethical behavior by taking a work-related trip with a Tech Center employee, noting that "[e]ven Ms. Hopkins testified as to the improper appearances created as a result of the trip." F&R at 104, J.A. at 152. However, the only evidence that ODRA cites to support the finding of "improper appearances" is Hopkins's testimony that the Tech Center employee "took some flack" for failing to coordinate transportation from the airport for all FAA employees on the plane—hardly an admission

9

of "improper appearances" and certainly not evidence of wrongdoing on the part of Hopkins. J.A. at 72–73. DSCI points to other flaws in ODRA's F&R as well. [5]

Having found flaws in ODRA's analysis, it does not necessarily follow that its decision was arbitrary, capricious, or unsupported by substantial evidence. In this case ODRA created an extensive and thorough record, and we must defer to an agency finding that is, as a whole, supported by such a record. Considering the record *in toto*, as we must, we agree with the FAA that it "would have been possible for a reasonable jury to reach the [agency's] conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67 (1998); *see also La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008) ("While there may be evidence supporting petitioner's position, we must determine 'not whether record evidence supports [petitioner]'s version of events, but

[5] Our review of the record confirms additional problems flagged by DSCI. For instance, ODRA implies that Schuman and Hopkins engaged in unethical behavior by arranging for Schuman's husband's employment with a company connected to DSCI: "Ms. Schuman's husband, Ed Schuman, retired from the [Tech] Center . . . to work for Technology and Management Associates, Inc. ('TMA'), a company that subcontracted work to DSCI." F&R at 18, Finding of Fact 51, J.A. at 66. Although Schuman later worked for TMA, ODRA mischaracterizes the evidence by omitting that Schuman left the Tech Center initially to work for another company, Northrop Grumman, which had no ties to DSCI. J.A. at 4138. Elsewhere, ODRA implies that DSCI attempted to manipulate the Tech Center into providing office space for DSCI employees, stating: "[T]he Contracting Officer . . . received a call from DSCI advising her that the FAA needed to set up a secured facility and DSCI was looking at office space to house future employees who would be involved in this effort." F&R at 42, Finding of Fact 135, J.A. at 90. Again, the portion of the record cited by ODRA fails to support the implication. In fact, the record reveals that "FAA Operational Support organizations ha[d] requested [DSCI] research and identify facilities space to house *their* [i.e., the FAA's] rapidly growing staff," *not* DSCI's staff. J.A. at 3439 (emphasis added).

whether it supports [the agency]'s.'" (quoting *Fla. Mun. Power Agency v. FERC*, 315

F.3d 362, 368 (D.C. Cir. 2003))).

Although DSCI's theory of the case is plausible, we can neither reweigh the

evidence as a new factfinder, *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005),

nor can we set aside an agency decision based on how we might view the evidence

ourselves. *Balsavage v. Dir., OWCP*, 295 F.3d 390, 395 (3d Cir. 2002). *See also*

*Slingluff v. OSHA*, 425 F.3d 861, 868 (10th Cir. 2005). Applying this deferential standard

of review, we conclude that the record as a whole supports the FAA Order for the reasons

discussed in the F&R.[6]

B.

DSCI alternatively contends that, even if we are unconvinced by the merits of its

first argument, we should still vacate the FAA Order and send the matter back to ODRA

with an order compelling the Department of Justice to obtain and inventory the "lost-but-

now-found" Williams file. According to DSCI, the FAA violated the APA, the FAA's

governing statute, and the Due Process Clause of the Fifth Amendment by concealing the

---

6 The evidence is certainly not overwhelming one way or the other, and the record is full of hearsay, diametrically opposed accounts of the same events, unsupported allegations of wrongdoing, and accusations that impugn the credibility of almost every individual involved in the whole affair. Ultimately, the resolution of such a conflict is best left to the factfinder. *Oughton v. NLRB*, 118 F.2d 486, 488 (3d Cir. 1941) ("It is not the function of the court to determine from the confusion of conflicting testimony where the truth lies."), *cert denied*, 315 U.S. 797 (1942). We agree with the FAA that the evidence can reasonably be viewed to support ODRA's credibility determinations and the version of the facts laid out in Part I.B, *supra*.

11

file, which was allegedly found in a Tech Center garbage can after the FAA issued its Order.

We are certainly troubled by the fact that DSCI makes a colorable argument that a long-time FAA official might have participated in the covering-up of misconduct by those working beneath him, Virga and Tran. We are also mindful of the fact that the Agency in this case created an expansive record, reviewed thousands of pages of depositions and other evidence, and afforded the parties ample opportunity to call witnesses. Even assuming, *arguendo*, that Williams's file contains everything that Hopkins alleges, we conclude that it would not have altered the overall evidentiary landscape or had any impact on the outcome of this case. Although, the file may contain notes that tend to support or discredit record testimony, Williams's final report and the depositions and hearing testimony of all of DSCI's witnesses (including Williams herself) already covered that ground. Additionally, the parties acknowledge that Williams's investigation focused on office environment, not on the administration of the DSCI contract, so the file's information regarding Tran and Virga would be more cumulative than relevant.

III.

For the foregoing reasons, we will deny DSCI's petition for review and deny its request that we remand for production of the Williams file.

12